[Nos. B148135, B157568, B165851. Second Dist., Div. Four. July 9, 2004.]

In re the Marriage of NANCY L. IREDALE and CLIFTON B. CATES III.
NANCY L. IREDALE, Appellant, v.
CLIFTON B. CATES III, Appellant

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, the portions of the opinion to be published are the following: Introduction, Factual and Procedural Background, Discussion, Part I.A., and the Disposition.

## Counsel

Troy & Gould and Jeffrey W. Kramer for Appellant Clifton B. Cates III.

Jaffe and Clemens, Daniel J. Jaffe, Linda R. Snyder; Law Offices of Bernard N. Wolf and Bernard N. Wolf for Appellant Nancy L. Iredale.

**O**PINION

**CURRY, J.**—

*Introduction*

In three consolidated appeals arising out of the dissolution of the marriage of Nancy L. Iredale and Clifton B. Cates III, Cates appeals from numerous rulings encompassed within the trial court's judgment concerning the division of community property and other economic issues, from a postjudgment order to enforce the judgment, and from a postjudgment order imposing sanctions on him for thwarting the policy of the law to promote settlement and encourage cooperation to reduce litigation costs. As to the first appeal, with but one exception, we find no merit in Cates's contentions. Iredale filed a cross-appeal as to the judgment; however, given our resolution of Cates's appeal, we conclude no relief is in order on the cross-appeal.

As to the second appeal concerning the postjudgment order enforcing the judgment, we conclude the trial court's ruling was in excess of its jurisdiction. We therefore reverse that portion of the order from which the appeal was taken, and remand the matter to the trial court.

As to the third appeal concerning the imposition of sanctions, we find no error and affirm the order.

*Factual and procedural background*

The parties married on November 26, 1976. They have two children, Clifton IV, born in 1982, and Michael, born in 1987.

Iredale filed a petition for dissolution of marriage on October 19, 1998. The parties separated in November 1998. Iredale contends they separated on November 2, 1998, citing Cates's response to the petition for dissolution. Cates apparently took the position later that they separated on November 30, 1998. The judgment does not specify the exact date of separation.

On May 24, 1999, the trial court issued a judgment of dissolution of marriage as to status only. The trial on the reserved issues took place over 20 hearing dates from October 1999 through June 2000.

The trial court issued a statement of decision on October 25, 2000. A judgment on the reserved issues was entered on January 30, 2001. Cates filed a notice of appeal from the judgment on February 13, 2001; Iredale filed a notice of cross-appeal from the judgment on March 2, 2001.

After the judgment on reserved issues was filed, and the notices of appeal and cross-appeal were filed, the parties filed various motions to enforce the judgment, and Iredale filed a motion requesting sanctions pursuant to Family Code section 271. Cates filed notices of appeal from two of the resulting orders; those appeals are the subjects of the consolidated appeals in B157568 and B165851.[1] The factual and procedural background as to these appeals will be discussed separately with regard to each.

*Discussion*

I. *B148135*

A. *Valuation of Iredale's Partnership Interest in PHJW*

1. *Factual Background*

Iredale, through her professional corporation, is a partner in the Los Angeles law firm of Paul, Hastings, Janofsky & Walker (PHJW). She became a partner in 1982. Cates, through his professional corporation, is a contract lawyer with the Washington, D.C. law firm of Ivins, Phillips and Barker.

The trial court assessed the community interest in Iredale's partnership interest in the PHJW law firm at $238,347, including goodwill valued at $42,318.[2]

Iredale testified that she holds an interest of .00781 in the PHJW law firm, through her professional corporation. PHJW has 165 partners. Iredale is not involved in management of the firm.

When she became a partner in 1982, Iredale signed its partnership agreement, which she had no opportunity to draft or modify. She periodically signed modifications of the agreement. When she became a partner, she was not required to buy into the firm's accounts receivable, work in progress, or goodwill. PHJW has been in existence since 1951, and at the time Iredale joined, the firm already had substantial clients and a fine reputation, which continue to date.

Iredale is expected to bill at least 1,800 to 1,900 hours per year. She devotes an additional 600 to 900 nonbillable hours per year to enhance her reputation as a lawyer and to attract clients to the firm.

---

[1] The appeal from a third postjudgment order, designated as B150855, was ordered dismissed pursuant to stipulation of the parties.

[2] Cates's law practice was valued at $57,227.

Donald Alfred Daucher, a partner at PHJW and its former managing partner, testified that every new partner must sign the partnership agreement, the terms of which are not negotiable. Incoming partners do not pay for any interest in the firm's accounts receivable, work in progress, or goodwill. Under the partnership agreement, a retiring partner receives his or her share of the firm's capital, calculated based upon that individual's percentage ownership interest in the firm. After a partner departs, he or she might not receive the balance in his or her capital account immediately; the firm may retain the capital account for up to five years. Upon leaving the firm, partners do not receive payment for the accounts receivable, work in progress, or goodwill. About 60 partners had left the firm over the prior seven years, and none received any payment for accounts receivable, work in progress, or goodwill.

Daucher testified that the firm does not retain much cash but instead distributes all the excess of cash over expenses each month, in an amount based upon each partner's percentage interest. Sometimes the firm distributes money to partners in amounts that exceed the income of the firm. Partners receiving such distributions would in essence be borrowing against their respective capital accounts.

Jeffrey Kinrich, a certified public accountant and financial analyst, testified as an expert witness on Iredale's behalf. He testified that Iredale's law practice interest had no goodwill and the value of her interest in the firm should be measured by the value of her capital account, $183,000. He noted that pursuant to the PHJW partnership agreement, individual partners do not own any of the accounts receivable, work in progress, or goodwill of the firm. The partnership owns these items, not the individual partners.

Kinrich testified that he performed several alternative calculations regarding Iredale's goodwill using a traditional capitalization of excess earnings approach. He compared her compensation with the average profits per partner of the top 100 law firms in the United States. After making two adjustments, for her years of tenure as a partner and for her billable hours, he concluded that Iredale received reasonable compensation for her services when compared to her peers, and that she was not receiving excess compensation even before taxes. Therefore, the value of her goodwill in PHJW was zero.

Kinrich also compared Iredale's compensation with that of peer attorneys in Los Angeles-based law firms and California-based firms with more than 100 equity partners. Compared to peer attorneys in the Los Angeles-based law firms, the receipts of Iredale's professional corporation exceeded the

annual income of an adjusted peer group by $33,000. After reducing that figure by about 49 percent to determine her after-tax, net excess earnings, Kinrich capitalized her net excess earnings by multiplying that figure by a factor of 2.5 (equivalent to a discount rate of 40 percent) to arrive at a valuation of Iredale's goodwill ($42,318).

Robert Daniels testified as a forensic expert on behalf of Cates. He valued Iredale's partnership interest in PHJW at $813,000 as of January 31, 1999 ($482,919 in net tangible assets including accounts receivable and work in progress, and $330,000 in intangible assets, i.e., goodwill). He did so by analyzing the PHJW firm as a whole, and did not examine Iredale's individual interest. To reach the $813,000 figure, he appraised the entire PHJW firm's tangible and intangible assets and then multiplied those figures by Iredale's percentage interest. Daniels acknowledged that PHJW existed for many years as an established national firm before Iredale became a partner, and thus the firm already possessed substantial goodwill when she became a partner.

Daniels did not rely on the capitalization of excess earnings approach as his main basis for computing Iredale's goodwill. He instead estimated Iredale's replacement cost by assessing the expense of replicating Iredale's services through the salary and billable hours of an associate attorney, i.e., an employee. He acknowledged that such an associate likely would not have the same book of business as Iredale. He also acknowledged that comparing Iredale's compensation to that of her peers, rather than to that of an associate attorney, was "one thing to consider" in valuing her goodwill. He maintained, however, that there was no valid statistical data available to determine reasonable compensation to hire someone with all her skills and experience. He testified that the excess earnings approach should not be used here because there is no valid statistical data available from which to determine what it would cost to hire someone to replace her.

In addition, Daniels testified he performed several "sanity checks" to corroborate his $813,000 figure. He did so based on the assumption that Iredale's billable hours were about 1,900 per year. He did not take into account the fact that Iredale was also required to spend hundreds of hours on nonbillable career advancement and business promotion activities.

Furthermore, Iredale received (through her professional corporation) $220,000 in distributions from PHJW in the months immediately following the parties' separation; these distributions were subtracted from her capital account before the date on which her interest in PHJW was valued (January 31, 1999, the end of PHJW's fiscal year).

## 2. *Contentions on Appeal and Discussion*

Cates argues that the trial court erroneously valued the community's interest in Iredale's partnership at PHJW based on what Iredale is entitled to receive under the partnership agreement if she withdraws from the firm (i.e., her capital account, valued on the date of separation at approximately $190,000, reflecting the value of her interest in the hard assets of the firm, but not the firm's accounts receivable, work in progress, or goodwill). Cates contends that the valuation should have been based instead on the value of her continuing interest in the firm as a going concern. Specifically, he argues that the value of Iredale's partnership interest, including her share of PHJW's accounts receivable and work in progress, but not including goodwill, is $666,265, versus the $190,000 "liquidation value" used by the court. Cates contends that, in addition, the community's interest in the PHJW partnership should have included goodwill in the amount of $330,000.

Cates contends: "When, as here, all of the evidence indicates that the law partnership and the spouse's interest in the partnership will continue indefinitely, the valuation must be as a going concern rather than a liquidation." (Citing *Brawman v. Brawman* (1962) 199 Cal.App.2d 876 [19 Cal.Rptr. 106]; *In re Marriage of Foster* (1974) 42 Cal.App.3d 577, 584 [117 Cal.Rptr. 49]; and *In re Marriage of Lopez* (1974) 38 Cal.App.3d 93, 105 [113 Cal.Rptr. 58].) Relying on *In re Marriage of Garrity and Bishton* (1986) 181 Cal.App.3d 675, 688–689 [226 Cal.Rptr. 485], he argues that Iredale's capital account was not the only asset to be valued, and that the court was required to take into account the practice's fixed assets, properly aged accounts receivable, costs advanced, and work in progress, in establishing the partnership's value. (See also *In re Marriage of Kilbourne* (1991) 232 Cal.App.3d 1518, 1522 [284 Cal.Rptr. 201], quoting *In re Marriage of Green* (1989) 213 Cal.App.3d 14, 21 [261 Cal.Rptr. 294].) While Cates's arguments would have some force under different circumstances, based upon the particular facts of this case we find no error.

General principles regarding valuation of a professional practice were set forth in *In re Marriage of Lopez, supra,* 38 Cal.App.3d 93. "In determining the value of a law practice or interest therein, the trial court should determine the existence and value of the following: (a) fixed assets, which we deem to include cash, furniture, equipment, supplies and law library; (b) other assets, including properly aged accounts receivable, costs advanced with due regard for their collectability; work in progress partially completed but not billed as a receivable, and work completed but not billed; (c) goodwill of the practitioner in his law business as a going concern; and (d) liabilities of the practitioner related to his business." (*Id.* at p. 110.)

While the guidelines set forth in *Lopez*, and followed in *In re Marriage of Garrity and Bishton* (1986) 181 Cal.App.3d 675, 688–689 [226 Cal.Rptr. 485], are generally applicable, the particular circumstances of each case, and each professional practice, will vary and call for different methods of valuation. Here, in declining to value Iredale's partnership interest based upon the value of PHJW's accounts receivable and work in progress, the court reasoned: "Since Petitioner did not buy or otherwise acquire an interest in the accounts receivable, work-in-process, or goodwill of the law firm under the Partnership Agreement, and because upon Petitioner's termination, voluntarily, involuntarily or through retirement, will not result in her receiving any share of the law firm's intangible assets [*sic*], the intangible assets consisting of accounts receivable, work-in-process, goodwill are not a community asset to be valued or divided in this action."

Thus, the trial court was not evaluating Iredale's interest in PHJW at liquidation value rather than as a going concern as Cates claims, but instead was looking at the specific interest which Iredale holds in PHJW. That interest does not include an entitlement, at any time, to collect a portion of the accounts receivable, work in progress, or goodwill of the law firm. The trial court reasonably concluded that Iredale's interest was limited to the value of her capital account, which reflected the value of her interest in the hard assets of the firm, but not the firm's accounts receivable, work in progress, or goodwill.

In *In re Marriage of Nichols* (1994) 27 Cal.App.4th 661 [33 Cal.Rptr.2d 13], cited in the court's statement of decision and relied upon by Iredale on appeal, the appellate court affirmed the trial court's valuation of the husband's interest in a law corporation where the applicable shareholder's agreement provided that a shareholder had no interest in the corporation's accounts receivable, work in progress, or goodwill. The income of the firm's shareholders/members depended not on their percentage interest as shareholders, but on employment agreements which based compensation on seniority and productivity. The appellate court held that the trial court did not abuse its discretion in using the corporation's stock purchase agreement, which excluded accounts receivable and work in progress, to value the community interest in the husband's law firm. (*Id.* at pp. 671–672.) In so doing, the court rejected wife's contention that the stock purchase agreement merely measured a shareholder's contractual withdrawal rights, and was inapplicable because husband was not withdrawing from the firm. The appellate court held that although the trial court was not valuing husband's contractual withdrawal rights, it was not precluded from using the stock purchase agreement to determine the community interest in the business. (*Id.* at p. 672.)

█    Similarly here, although PHJW is a partnership rather than a corporation and Iredale is a partner and not a shareholder with an employment agreement, the values of PHJW's accounts receivable, work in progress, and goodwill are not relevant to a valuation of Iredale's interest in the firm. Pursuant to the partnership agreement she signed when she joined the firm, individual partners do not own any of the accounts receivable, work in progress, or goodwill of the firm; these items are owned by the partnership itself. We conclude that the trial court did not abuse its discretion in using the value of Iredale's capital account to determine the community interest in PHJW; she held no entitlement to claim a portion of the accounts receivable, work in progress, or goodwill of the law firm as a going concern.

After concluding that Iredale did not have an interest in a proportionate share of the goodwill of her law firm, the court determined that Iredale herself possessed goodwill, and accepted the value of that goodwill offered by her expert, $42,318, finding her goodwill to be "partially a community asset." As detailed above, the court's finding was based on testimony by Iredale's expert that Iredale's compensation from her law firm is slightly more than the average compensation of her peers at other major Los Angeles law firms. Cates argues this is a misapplication of the excess earnings methodology, contending that in determining excess earnings, the spouse's earnings must be compared not to the earnings of her peers, but to the cost of replicating her earnings *by a salaried employee* whose compensation does not include a share of the firm's profits, relying on *In re Marriage of Garrity and Bishton, supra,* 181 Cal.App.3d 675, 688, footnote 14. He argues that the method accepted by the trial court primarily measured the relative profitability of the PHJW law firm compared to other major law firms, rather than measuring the goodwill Iredale enjoys as a partner in a major law firm, in comparison to others without such a valuable asset.

"Goodwill value may be measured by 'any legitimate method of evaluation that measures its present value by taking into account some past result,' so long as the evidence 'legitimately establishes value.' " (*In re Marriage of Rosen* (2002) 105 Cal.App.4th 808, 819 [130 Cal.Rptr.2d 1], quoting *In re Marriage of Foster, supra,* 42 Cal.App.3d 577, 584.) "The trial court possesses broad discretion to determine the value of community assets as long as its determination is within the range of the evidence presented. [Citation.] The valuation of a particular asset is a factual question for the trial court, and its determination will be upheld on appeal if supported by substantial evidence in the record. [Citation.]" (*In re Marriage of Nichols, supra,* 27 Cal.App.4th 661, 670.)

In *In re Marriage of Rosen, supra,* 105 Cal.App.4th 808, a case decided after the trial at issue here, the appellate court stated that the " 'annual salary of the average salaried person' standard of *In re Marriage of Garrity and Bishton* is not the only standard for establishing reasonable compensation under the excess earnings method." (*Id.* at p. 823.) "[R]easonable compensation may also be based upon ' "the cost of hiring a nonowner outsider to perform the same average amount that other people are normally compensated for performing similar services" '—the 'similarly situated professional' standard. Expert testimony . . . would be helpful in determining which approach (the 'average salaried person' or the 'similarly situated professional') is appropriate under the facts of a case and in applying the relevant approach to determine reasonable compensation."[3] (*Ibid.*)

■ We agree with the *Rosen* court that the "average salaried person" standard is not the only valid measure for establishing reasonable compensation under the excess earnings method. Where supported by substantial evidence, use of the "similarly situated professional" standard, as advocated by Iredale's expert and adopted by the trial court here, is appropriate. Iredale's expert testified that as compared to peer attorneys in Los Angeles-based law firms, Iredale's professional corporation received excess gross compensation of $33,000 annually. Capitalizing her net excess earnings produced the goodwill value of $42,318.

We conclude that the trial court's use of the "similarly situated professional" standard to calculate goodwill was entirely reasonable and supported by substantial evidence. Cates's own expert had to concede that his method of comparing Iredale's compensation to what it would cost to hire an associate (actually 1.4 associates) did not account for the nonbillable hours expended by Iredale, nor would an associate be likely to have a client base comparable to Iredale's. Comparing Iredale's compensation to that of similarly situated professionals, rather than to a salaried employee, was indeed a more rational and reasonable method by which to calculate the value of Iredale's goodwill in this case.

Cates further argues the judgment ignored the community's interest in the $220,000 distribution declared and debited by PHJW to Iredale's capital account before January 31, 1999, the date which the parties agreed to use as the valuation date for Iredale's partnership interest (that date being the end of

---

[3] The *Rosen* court was assisted in reaching its conclusion in this regard by an amicus curiae petition filed by the California Society of Certified Public Accountants.

PHJW's fiscal year), thus reducing Iredale's capital account in the firm to the $190,000 value used by the court. The $220,000 distribution was considered to be her separate property, and this also resulted in a lower value for her capital account for purposes of computing Cates's share of that community asset. Cates requests that we modify the judgment to include as a community asset the $220,000 in "distributions due to partners" that PHJW deducted from Iredale's capital account or, alternatively, to add that amount back into Iredale's capital account in valuing her partnership interest in the law firm. We decline to do either.

As Iredale points out, the parties separated in November 1998. Iredale received the distribution of $220,000 on February 4, 1999. The distribution was for her services in January 1999, i.e., her postseparation work. The earnings of each spouse following the date of separation are separate property. (Fam. Code, § 771.) The fact that the parties agreed for purposes of trial to value Iredale's law practice interest as of January 31, 1999, does not convert her demonstrably separate earnings into community property.

B.–IV.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Disposition*

As to the appeal and cross-appeal in case number B148135, the judgment on reserved issues entered January 30, 2001, is reversed as to the valuation of Cates's professional corporation, and remanded to the trial court for recalculation of the equalizing payment due to Cates in keeping with the views expressed in this opinion. In all other respects, the judgment is affirmed. Iredale is awarded her costs on appeal in B148135.

As to the appeal in case number B157568, the order of February 1, 2002 regarding the valuation date for division of the Thrift Savings Plan assets is reversed. Cates is awarded his costs on appeal in B157568.

---

*See footnote, *ante*, page 321.

As to the appeal in case number B165851, the order of February 28, 2003 is affirmed in full. Iredale is awarded her costs on appeal in B165851.

Epstein, Acting P. J., and Hastings, J., concurred.

A petition for a rehearing was denied August 2, 2004.