[Nos. G034259, G034582. Fourth Dist., Div. Three. Dec. 27, 2006.]

In re the Marriage of BORIS M. and ANN E. ACKERMAN.
BORIS M. ACKERMAN, Respondent, v.
ANN E. ACKERMAN, Appellant.

## COUNSEL

Law Offices of Brian G. Saylin, Brian G. Saylin; Law Offices of Ellen G. Winterbottom, Ellen G. Winterbottom; Law Offices of Jeffrey W. Doeringer and Jeffrey W. Doeringer for Appellant.

Keith E. Dolnick for Respondent.

## OPINION

**RYLAARSDAM, J.**—This is a consolidated appeal arising out of the dissolution of the marriage of Ann E. Ackerman (wife) and Boris M. Ackerman (husband). In the two appeals, wife respectively challenges the trial court's valuation of husband's medical practice and the award of child and spousal support. We reject those challenges and affirm the judgment.

## FACTS

The parties married in August 1991 and legally separated in September 2001. During the marriage, they had two children. At the time of separation, Ethan was three and Audrey was one. Ethan was diagnosed with autism at age two and a half.

Husband is a licensed physician engaged in the practice of plastic surgery. He obtained his physician's license in 1981 and received his board certification in plastic and reconstructive surgery in 1987, at which time he established his medical practice as a sole proprietorship known as Boris M. Ackerman, M.D. Wife signed a premarital agreement, reflecting the practice was husband's separate property with a value of $162,000 as of the date of marriage. Any increase in the medical practice's value would be deemed community property and subject to division upon dissolution. Upon dissolution, the practice would be appraised by a forensic accountant utilizing any generally accepted methodology for valuation.

Wife was not employed outside the home during marriage. She graduated from law school in 1995 and took the California State Bar examination in 1998, but was unsuccessful.

The valuation of the medical practice was litigated, with each party presenting his or her own forensic accountant. The court received briefs and then made its final ruling. Wife filed objections to the proposed statement of decision. The trial court responded to each objection in a detailed minute order. Judgment on the bifurcated issue of the medical practice was entered some months later. Wife filed a notice of appeal from that judgment.

In the meantime, the parties litigated support. They stipulated their monthly controllable cash flow at the date of separation was $61,000. The parties' 2001 jointly filed tax return showed a net income of approximately $36,000. The court took half that amount, rounded it up to $20,000 as a reasonable estimate of half of the community net income, and determined that to be the marital standard of living for each party.

For spousal support, husband was ordered to pay wife $7,500 per month commencing January 15, 2004, $6,500 per month commencing September 1, 2004, and $3,000 per month commencing September 1, 2005. In August 2006, spousal support terminated and in August 2009, jurisdiction terminates. The order was based on three assumptions: (1) wife would review for the bar exam and take it in July 2004; (2) if she passed, she would obtain employment as an attorney before September 1, 2005, when the step-down order took effect; (3) regardless of whether she passed, she would be able to secure

employment by September 1, 2004, and earn at least $3,000 a month as a paralegal or legal assistant, based on her own testimony and the vocational examiner's report. If the assumptions do not materialize, the order allows wife to move to modify its terms.

Child support was ordered as follows: $10,070 per month for seven and one-half months commencing January 15, 2004, then $9,080 per month commencing September 1, 2004. The reduction took into account wife's potential earning capability.

Wife filed a notice of appeal from this judgment as well. We consolidated the two appeals for all purposes.

## DISCUSSION

### 1. *Introduction*

Wife challenges the trial court's valuation of husband's medical practice and award of child and spousal support. In assessing these contentions, we begin with the well-established rule that "[a] judgment or order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness. [Citations.]" (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133 [275 Cal.Rptr. 797, 800 P.2d 1227].) The deferential abuse of discretion standard governs our review. (*In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 282–283, 304 [111 Cal.Rptr.2d 755] [child and spousal support orders] (*Cheriton*); *In re Marriage of Nichols* (1994) 27 Cal.App.4th 661, 670 [33 Cal.Rptr.2d 13] [determination of goodwill value].) Generally, "the appropriate test of abuse of discretion is whether or not the trial court exceeded the bounds of reason, all of the circumstances before it being considered. [Citations.]" (*In re Marriage of Connolly* (1979) 23 Cal.3d 590, 598 [153 Cal.Rptr. 423, 591 P.2d 911].) To the extent that a trial court's exercise of discretion is based on the facts of the case, it will be upheld "as long as its determination is within the range of the evidence presented. [Citation.]" (*In re Marriage of Nichols*, *supra*, 27 Cal.App.4th at p. 670.) Conversely, a court abuses its discretion if its findings are wholly unsupported, since a consideration of the evidence "is essential to a proper exercise of judicial discretion. [Citation.]" (*Johns v. City of Los Angeles* (1978) 78 Cal.App.3d 983, 998 [144 Cal.Rptr. 629].)

Findings will be normally implied to support judgments or orders if supported by substantial evidence. (*In re Marriage of Aninger* (1990) 220 Cal.App.3d 230, 238 [269 Cal.Rptr. 388], overruled by statute on another ground as stated in *In re Marriage of O'Connor* (1997) 59 Cal.App.4th 877, 882 [69 Cal.Rptr.2d 480].) But where a party states objections, and the

statement of decision does not resolve a particular issue, "it shall not be inferred on appeal . . . that the trial court decided in favor of the prevailing party . . . on that issue." (Code Civ. Proc., § 634.)

## 2. Medical Practice Valuation

Wife contends the trial court's valuation of husband's medical practice should be reversed because the value of the tangible assets—specifically cash, medical equipment, and an excluded asset—and the goodwill value ascribed to the practice were not supported by substantial evidence. Additionally, she argues, "The court failed to make a finding as to [her] community interest in the rents received . . ." from the surgical center that was built during marriage as part of husband's medical practice. We address these in turn.

### a. Tangible Assets

#### i. Cash

The court found the total cash in husband's medical practice was $35,388, but deducted "accrued liability" to arrive at a net figure of $13,388. Wife argues this was error because there were only two accounts at issue and one of those "had only one outstanding check in the amount of $2,406," while the other had "no outstanding checks." Since her accountant, Glenn Mehner, "reconciled those accounts as of the date of separation[] at $30,442," she asserts "[i]t is unknown how the court could have selected any other number" and that, because she objected, we may not infer the trial court decided in husband's favor on this issue.

No inference is necessary. At the hearing on wife's objections, the court explained it arrived at $13,388 by taking "either outstanding liabilities or outstanding checks, and . . . took it off the $35,000." This finding is supported by Mehner's valuation report. At page 6 of that report, Mehner explains that $35,388 "[r]epresents cash balance at 8/31/01 in [husband's two accounts]" but that $22,000 is "[e]stimated as approximately one-half months [sic] expenses based on average monthly expenses for the eight months end[ing] August 31, 2001." Deducting the expenses from the cash balance yields $13,388, the number reached by the court.

#### ii. Medical Equipment

Wife contends the court's determination the medical equipment had a current value of $10,000 lacked substantial evidence. We disagree.

The record is somewhat confusing on this issue because the court's oral and written rulings do not contain any references to "medical equipment."

Rather, the only time during its oral ruling that it mentioned $10,000 is when it said it "didn't believe that the office furniture exceed[s] $10,000[,] so [it] used that." Similarly, both the proposed and signed statement of decision, as well as the signed judgment, "add[] back $10,000 for the office furniture" to the amount awarded for goodwill. Neither party addresses this ambiguity but instead assumes the court's references to "office furniture" include medical equipment. We will do the same.

In his report, husband's expert, James Christensen, identifies the categories of office furniture, leasehold improvements, and medical equipment, along with their corresponding dates of purchase, original cost, depreciation, book value as of December 2001, and estimated current value. The original cost of the office furniture and medical equipment together totaled $111,370. After depreciation, their book value was $7,326. Christensen estimated their current value to be approximately $11,000.

Rather than relying on the estimated current value, the court used an accelerated or straight-line depreciation method and placed a $10,000 value on the furniture and medical equipment. According to Christensen's chart, the original cost of the office furniture and medical equipment in 1995–1996 was $46,278 and $65,092, respectively. By December 2001, their book value had depreciated to $3,455 and $3,871. Wife has not shown the court abused its discretion by rounding the total up to $10,000.

Wife claims Christensen's only basis for his estimate of the current value of the furniture and medical equipment was a conversation with another plastic surgeon. Whether it was or not is irrelevant because the trial court did not rely on Christensen's current value estimate.

### iii. *Excluded Asset*

Wife's next contention relates to husband's medical practice's purchase of new computers for $7,900 in February 2001, six months before they separated. Wife objected to the proposed statement of decision on the ground that the computers were a "missed asset" because neither expert included computers in his analysis. The court overruled wife's objection because "[t]here was no evidence as to a 'missed asset.' "

On appeal, wife acknowledges that Christensen considered the computers, but asserts "he added this expense back as personal in nature without any basis therefor." To the contrary, Christensen testified he added back certain nonrecurring office expenses and legal expenses, and that the computers were a nonrecurring or personal expense. The trial court was correct there was no evidence of a missed asset.

b. *Goodwill*

Wife argues substantial evidence does not support the court's calculation of goodwill. We disagree.

█ No rigid rule applies for determining the value of goodwill. (*In re Marriage of Foster* (1974) 42 Cal.App.3d 577, 583 [117 Cal.Rptr. 49].) Rather, it "may be measured by 'any legitimate method of evaluation that measures its present value by taking into account some past result,' so long as the evidence 'legitimately establishes value.' [Citation.]" (*In re Marriage of Rosen* (2002) 105 Cal.App.4th 808, 819 [130 Cal.Rptr.2d 1] (*Rosen*).) "[E]ach case must be determined on its own facts and circumstances and the evidence must be such as legitimately establishes value. [Citations.]" (*In re Marriage of Foster, supra*, 42 Cal.App.3d at p. 583.) Because goodwill value of a business is a question of fact for the trial court, its determination will be upheld if supported by substantial evidence. (*In re Marriage of Nichols, supra*, 27 Cal.App.4th 661, 670.)

█ The "capitalization of excess earnings" method is one recognized valuation technique. (See *Rosen, supra*, 105 Cal.App.4th at pp. 818–819.) This "method focuses on the ' "earning power" ' of the business to determine what ' "rate of return" ' the predicted earnings will yield in light of the risks involved to attain them. [Citation.]" (*Id.* at p. 818.) "Broadly put, the excess earnings approach is predicated on a comparison of the earnings of the professional in question with that of a peer whose performance is 'average.' " (*In re Marriage of McTiernan & Dubrow* (2005) 133 Cal.App.4th 1090, 1095 [35 Cal.Rptr.3d 287], fn. omitted.)

To make this comparison, courts may, among other things, "determine[] the annual salary of a typical salaried employee who has had experience commensurate with the spouse who is the sole practitioner or sole owner/employee." (*In re Marriage of Garrity and Bishton* (1986) 181 Cal.App.3d 675, 688, fn. 14 [226 Cal.Rptr. 485].) Alternatively, courts may apply the "similarly situated professional" standard, under which reasonable compensation is based on " ' " 'the cost of hiring a nonowner outsider to perform the same average amount that other people are normally compensated for performing similar services . . . .' " ' " (*In re Marriage of Iredale & Cates* (2004) 121 Cal.App.4th 321, 330 [16 Cal.Rptr.3d 505], fn. omitted, quoting *Rosen, supra*, 105 Cal.App.4th at p. 823.)

Although not binding, professional compensation surveys may be used by experts and trial courts as guidelines for determining reasonable compensation of a practitioner's peers. (*In re Marriage of Iredale & Cates, supra*, 121 Cal.App.4th at pp. 325–326 [affirming expert's use of own surveys to

determine reasonable compensation of practitioner's peers for purposes of valuing her personal goodwill]; *Rosen, supra,* 105 Cal.App.4th at p. 822.) To be relevant, however, the surveys must account for similarly situated professional practices and practitioners. (*Rosen, supra,* 105 Cal.App.4th at p. 822.)

The court in this case applied the excess earnings valuation method. Wife challenges only its determination of reasonable compensation for husband's peers. Each side's expert relied on different surveys to arrive at different figures.

Mehner utilized the Medical Group Management Association Physician Compensation and Production Survey (MGMA survey) because it broke down statistics by region, specialty, and years in practice and was the most comprehensive survey in his opinion. He relied on the Pacific region, which encompasses the western states. Based on the MGMA survey, he calculated reasonable compensation to be $291,000 under the median compensation and $355,000 under the 75th percentile.

Christensen, on the other hand, based his opinion on statistical data from the American Medical Association's Physician's Socioeconomic Statistics surveys (AMA survey) for the United States. The survey relied on information from 1996, 1997, 1998, and 2000; there was no study relying on 1999. He calculated the total revenue for self-employed surgeons, the professional expenses for self-employed physicians under the category of surgeons, and the net income of self-employed surgeons, and then calculated the net income as a percentage of the total revenue. As "a sanity check," he took husband's "net income as a percentage of the total revenue" and applied it to husband's "gross revenue in order to calculate what reasonable compensation would be as a percentage of his gross revenue." At the court's request, he also provided a rebuttal to Mehner's report and included the results of his own personal survey of plastic surgeons in the Newport Beach area. Although the local survey was admittedly "limited," Christensen used it to show husband "generates almost the 'average' amount of revenue." He determined reasonable compensation to be approximately $515,000, which was lower than the $551,000 average compensation paid to the local survey group.

The court found problems with the surveys submitted by both experts. As to the MGMA survey, the court was "troubled by [what a national survey of the western states has] to do with a plastic surgeon who is doing essentially cosmetic surgery in Newport Beach." The court considered it common knowledge that, unlike other types of surgery, cosmetic surgery used discretionary income and the amount of discretionary income in Southern California "is remarkably different . . . than in such places as Pocaltella [*sic*], Idaho; or Gallow [*sic*], New Mexico; or Little Rock, Arkansas."

As to Christensen's report, the court was not sure it had "any stronger basis other than the fact he went out and talked to a couple of people as a kind of quality control check . . . ." It noted the difficulty of relying on reasonable compensation statistics for employees, stating, "it just boggles the mind to think" anyone making as much money as husband would work for an employer and receive "a third of what he's actually making."

Accordingly, the court applied its "own quality control," observing that husband "is a guy with peculiar talent, training and expertise that is making a rather substantial amount of money because, among other things, . . . he has a special reputation in the community and he's doing this[,] in large part, as a self-employed person . . . ." The court used "[its] own kind of common sense view" of husband's track record and ultimately determined the amount of reasonable annual compensation to be $544,000.

In response to wife's request for an explanation on how that number was reached, the court responded that it had been troubled that the surveys submitted by the parties were not "sufficiently fine-tuned and honed to our area here to be particularly valuable," and neither party presented "a vocational rehabilitation specialist who's more familiar with the local market," "a medical head hunter [sic], or an economist, or something like that to supplement" the surveys. Nevertheless, it stated it had not "pick[ed] a number out of the air" but had used as a "curbstone" the methodology set forth by Christensen, "which was the percentage of gross method on his national scale . . . or a western states average . . . ."

■ Despite wife's contention to the contrary, substantial evidence supports the determination of $544,000 as reasonable compensation for a similarly situated professional. In establishing goodwill value, "opinion evidence is admissible but is not conclusive. [Citation.] The trier of fact may also take into consideration the situation of the business premises, the amount of patronage, the personality of the parties engaged in the business, the length of time the business has been established, and the habit of its customers in continuing to patronize the business. [Citation.]" (*In re Marriage of Foster*, *supra*, 42 Cal.App.3d at p. 583.) The record shows the court did just that. It used Christensen's methodology as a "curbstone," but then also applied its own "quality control" and "common sense view" by considering evidence of husband's actual business situation, talent, training, expertise, and reputation. The trial court reasonably determined that a plastic surgeon in Newport Beach, California would generate a greater income than the national average. Because the court relied upon evidence set out in the testimony and expert reports, its determination of reasonable compensation for a similarly situated professional is supported by substantial evidence.

Wife's challenge that the court referred to Christensen's survey as covering the western states when in fact it was a national survey is without merit. We review the result, not the trial court's reasoning, and do not consider comments by the trial judge. (*Whyte v. Schlage Lock Co.* (2002) 101 Cal.App.4th 1443, 1451 [125 Cal.Rptr.2d 277].)

■ Next, wife attacks the two surveys underlying Christensen's opinion. According to wife, reliance on a national average is "unhelpful" because under *Rosen, supra,* 105 Cal.App.4th at page 822, the numbers presented in a survey "must be shown to actually relate to the subject practice." *Rosen* reversed the trial court's determination of reasonable compensation on the ground that "the testimony of [the wife's] expert regarding 'reasonable compensation' [was] conjecture and could not be used in forming an expert's opinion of goodwill value." (*Id.* at pp. 821–822.) The expert had relied on two surveys to determine reasonable compensation for the husband, a sole practitioner lawyer handling state-funded criminal appeals. The first was a national survey, which the court faulted because there was no showing the national figures were commensurate with those in Southern California and because it did not distinguish between different types of law practices, particularly one consisting "almost exclusively of . . . state-funded criminal appeals." The second survey was also problematic because it purported to show average compensation for officers and directors of various kinds of businesses, whereas the husband was a sole practitioner with no officers or directors. The expert did not have any particular knowledge of lawyer compensation, was not familiar with the husband's type of law practice, and did not attempt to relate the information in the two surveys to an analysis of the husband's law practice. (*Ibid.*) Thus, *Rosen* concluded the surveys used by the wife's expert were not useful in establishing compensation under either the " 'annual salary of the average salaried person' " standard or the " 'similarly situated professional' " standard. (*Id.* at p. 823.)

Here, in contrast, the AMA survey shows the nationwide total revenue, the professional expenses, and the net income of self-employed surgeons. Christensen explained he had based his valuation on the five years preceding separation by analyzing husband's tax returns and financial records. He detailed the study dates he utilized and his methodology of calculating total revenue for self-employed physicians and expenses for self-employed surgeons to ascertain a net income as a percentage of the total revenue. Although wife is correct "there [was] no evidence that . . . Christensen has any particular expertise of plastic surgeon compensation (as he had never valued a plastic surgery practice before)," unlike in *Rosen,* Christensen related the information in the AMA survey to an analysis of husband's practice to ensure his figure was accurate. First, he inserted husband's gross revenue and net income to see what result he reached. Second, he performed a local survey of Newport Beach plastic surgeons to assess whether his number was correct.

Unlike the surveys in *Rosen*, the AMA survey thus proved useful as a baseline to establish compensation under the "similarly situated professional" standard.

Wife's contention the MGMA survey was better than the AMA survey amount to nothing more than a request that we resolve the conflict between the experts, reweigh the evidence, and substitute our judgment for that of the trial court. We will not do so because "resolution of conflicts in the evidence, assessment of the credibility of the witnesses and the weight to be given the opinions of the experts were all matters within the exclusive province of the trier of fact." (*Ellena v. State of California* (1977) 69 Cal.App.3d 245, 256 [138 Cal.Rptr. 110].)

The court considered both experts' testimonies and the surveys upon which they were based. Having done that, and the parties having failed to present any other evidence to supplement the surveys, the court ultimately relied on Christensen's methodology, because it thought that "made some sense." In doing so, it "exercised its discretion weighing the facts and the evidence such as it was." Although the court considered the MGMA survey, it found it to be "of little value . . . ." Wife's claim that the court failed to exercise its discretion in rejecting the MGMA survey lacks merit.

Regarding Christensen's local survey, wife complains it was conducted after expert reports were exchanged and the information presented "could not be corroborated or verified, . . . and there was no way to ascertain the accuracy of the numbers or their relevance to [husband's] practice." But the court "gave very little weight to this 'survey' " and did not consider it.

Lastly, wife objects to the court placing the burden of securing a vocational rehabilitation specialist or a medical headhunter on her alone. The court did no such thing. It faulted both parties for failing to supplement the surveys and expert testimony with additional evidence. Absent such evidence, the court had no choice but to pick the methodology it believed would best establish reasonable compensation under the facts of the case. It did not abuse its discretion in doing so.

### c. *Surgical Center*

Husband's medical practice included a surgery center that was built out during the marriage in 1996. Wife contends it was a separate business from husband's medical practice and that the court erred in determining otherwise. Substantial evidence supports the court's conclusion.

From 1996 to 2000, husband did not rent out the surgical center. In January 2001, a Dr. Grover began renting it on a monthly basis. But there was no

separate bank account set up for the surgical center and no separation of expenses attributable to it. For these reasons, and because Dr. Grover had rented the room for only eight months prior to the date of separation, Christensen testified the surgical center was not a separate business from the medical practice. The court did not abuse its discretion in adopting Christensen's opinion.

Wife argues the court failed to give an explanation of its findings, as required under Code of Civil Procedure section 634, and instead merely "responded it did not believe that goodwill could be derived from a 'month-to-month tenancy.' " This misrepresents the record and takes the court's comments out of context. Although the court did "wonder . . . how do you get good will [*sic*] out of a leasehold which is a month-to-month tenancy," it also identified the factors upon which it relied. These include its belief the situation was "somewhat akin to renting out empty [office] space," and the facts that there was no separate accounting and "nobody in the community really considered this to be a totally separate entity over . . . and above the plastic surgery practice." It also includes the fact that Mehner could not categorize the expenses that were attributable solely to the surgical center, as opposed to husband's main practice.

Wife maintains the court misunderstood the evidence in stating there was no separate bookkeeping or accounting for the surgical center. She asserts husband kept a separate ledger identifying Dr. Grover's gross receipts and rental income and reported the rental income on his 2001–2003 income tax returns, and that Mehner "used reasonably accepted accounting principles to arrive at the expenses associated with the [surgery c]enter, in order to deduce net cash flow." The trial court considered this evidence and rejected it. We will not reweigh the evidence.

Additionally, the record does not support wife's claim the court "simply rejected [Mehner's opinion], without comment." The court explained that Mehner's testimony regarding "the expense portion . . . was, at best, conjectural in terms of what the expense component of the [surgical] center was. They were a series of extrapolations which were not explained satisfactor[il]y . . . ." Mehner himself acknowledged that his analysis was simply an *estimate* of what expenses "*might* be" "based upon what would make sense . . . in terms of *potential* expenses that *might* be associated with that surgery portion of the facility." (Italics added.) Given the speculative nature of Mehner's testimony, the court was well within its discretion in concluding as it did.

We reject wife's contention the surgical center was a community asset that should be separately valued as of the trial date. The parties stipulated that the

medical practice should be valued as of the date of separation. They left for trial, however, the issue of whether the surgical center was a freestanding center, in which case wife argued its goodwill value should be determined as of the time of trial. Once the trial court determined the surgical center was an indivisible part of the medical practice, the parties' stipulation required it to be valued as of the date of separation.

As a fallback position, wife argues that even if the surgical center was part of the medical practice, the court "deprived the community of its fair share" by using the rental income received from Dr. Grover in the first eight months of 2001, then weighting it using "the prior five years for which [husband] reported no rental income," rather than considering the increasing postseparation rental income. We discern no error.

■ In *Rosen*, the court observed that the excess earnings method of determining a professional practice's goodwill requires an initial determination of " 'a practitioner's *average* annual net earnings . . . by reference to any period that seems reasonably illustrative of the current rate of earnings.' [Citation.]" (*Rosen, supra,* 105 Cal.App.4th at p. 820.) Because the husband's net income was volatile, the court held that using his net income for one year "alone is neither an average nor 'reasonably illustrative' of his earnings," and thus the husband's expert " 'should have averaged it.' " (*Ibid.*) Following *Rosen*, the court in this case appropriately weighted the income over the five years before the separation because "the rental income [was] part of the general overall income stream of the practice and that is part and parcel of the weighted income average."

Wife is correct that "*Rosen* did not provide that a single year is always wrongly used." But her assertion that "the last year was, and is, the best illustrator of . . . the current income of the center" is flawed because it incorrectly assumes the surgical center was a separate business.

### 3. *Spousal and Child Support*

Wife contends: (1) the court's support orders left her and the children at a standard of living significantly below that enjoyed by husband; (2) income from earnings and property should not have been imputed to her and the wrong methodology was used in any event; (3) a stepdown in support was improperly based on her future earning capacity; (4) all of husband's income should have been considered in setting support; and (5) the court otherwise erred in computing support. We find no error.

### a. *Spousal Support*

■ "Spousal support is governed by statute. [Citation.] In ordering spousal support, the trial court *must* consider and weigh all of the circumstances enumerated in [Family Code section 4320], to the extent they are relevant to the case before it. [Citations.] The first of the enumerated circumstances, the marital standard of living, is relevant as a reference point against which the other statutory factors are to be weighed. [Citations.] The other statutory factors include: contributions to the supporting spouse's education, training, or career; the supporting spouse's ability to pay; the needs of each party, based on the marital standard of living; the obligations and assets of each party; the duration of the marriage; the opportunity for employment without undue interference with the children's interests; the age and health of the parties; tax consequences; the balance of hardships to the parties; the goal that the supported party be self-supporting within a reasonable period of time; and any other factors deemed just and equitable by the court. [Citation.]" (*Cheriton, supra,* 92 Cal.App.4th at pp. 302–304, fns. omitted.) The trial court has broad discretion in balancing the applicable statutory factors and determining the appropriate weight to accord to each, but it may not be arbitrary and must both recognize and apply each applicable factor. (*Id.* at p. 304.) Once it does, "the ultimate decision as to amount and duration of spousal support rests within its broad discretion and will not be reversed on appeal absent an abuse of that discretion. [Citation.]" (*In re Marriage of Kerr* (1999) 77 Cal.App.4th 87, 93 [91 Cal.Rptr.2d 374].) " 'Because trial courts have such broad discretion, appellate courts must act with cautious judicial restraint in reviewing these orders.' [Citation.]" (*Ibid.*)

Here, wife contends the trial court did not properly consider various factors in determining the amount of spousal support. We turn to these now.

### i. *Marital Standard of Living*

■ One of the factors the court must consider in awarding spousal support is "[t]he needs of each party based on the standard of living established during the marriage." (Fam Code, § 4320, subd. (d); all further statutory references are to this code unless otherwise indicated.) The marital standard of living has been described as "reasonable needs commensurate with the parties' general station in life. [Citation.]" (*In re Marriage of Smith* (1990) 225 Cal.App.3d 469, 491 [274 Cal.Rptr. 911] (*Smith*).) The actual marital standard of living is not "an absolute measure of reasonable need, but merely a 'basis' or reference point for determining need and support." (*Id.* at p. 484.) "It is a general description, not intended to specifically spell out or narrowly define a mathematical standard." (*Id.* at p. 491.) As such, "it is not in and of itself sufficient to sustain an award of permanent support. [Citation.]

Likewise, a disparity in income, standing alone, does not justify an award of spousal support. [Citation.]" (*In re Marriage of Zywiciel* (2000) 83 Cal.App.4th 1078, 1081 [100 Cal.Rptr.2d 242].) In assessing the parties' marital standard of living, the trial court may consider their income, expenses, and lifestyle during their marriage. (*Cheriton, supra*, 92 Cal.App.4th at p. 307.) The court did so in this case and concluded the marital standard of living was $20,000 as to each party.

Wife argues this was error because the court did not consider her expenses. She contends that because *Cheriton* determined the marital standard of living by taking the total family income, adjusting it for the husband's absence, and deducting specific expenses, the trial court had a duty to do the same. It did not.

■ Although a court may properly consider both income and expenses in determining the marital standard of living (*Cheriton, supra*, 92 Cal.App.4th at p. 307, fn. 23), it may also base it on the family's average income, rather than expenses. (*In re Marriage of Weinstein* (1991) 4 Cal.App.4th 555, 566 [5 Cal.Rptr.2d 558] (*Weinstein*).) Average income is particularly appropriate where, as here, there was evidence the parties lived beyond their means. (*Ibid.*) Moreover, the court considered wife's claimed expenses of $50,000 a month but found them unreasonable when compared to the $61,000 gross average a month husband made prior to separation and the $87,500 a month the parties stipulated that husband was making or was capable of making. The trial court was not required to accept wife's assertion of claimed expenses and acted within its broad discretion in determining what it deemed her actual needs and expenses. (*Smith, supra*, 225 Cal.App.3d at p. 487.)

Likewise, the record does not support wife's claim the court ignored evidence of the parties' pattern of savings and investment, as required by *In re Marriage of Drapeau* (2001) 93 Cal.App.4th 1086 [114 Cal.Rptr.2d 6]. That case held only that "the trial court should have considered the parties' practice of savings as an element in their [marital standard of living]." (*Id.* at p. 1098.) Here, the trial court acknowledged there was evidence of "a couple of savings plans" and that the parties had "put some bucks aside." But it also found that during the marriage, they had "spent everything [husband made] every month." Even after separation, wife continued to spend "everything every month and then some." Whether the parties were living beyond their means is an appropriate factor for the trial court to balance against other considerations in order "to reach a 'just and reasonable' result." (*Smith, supra*, 225 Cal.App.3d at p. 490; see also *Weinstein, supra*, 4 Cal.App.4th at p. 566.)

The record also belies wife's assertion the court did not consider her efforts in raising the children and tending to one child's special needs. The court

assessed evidence of wife's child-rearing obligations, including with respect to the autistic child, but disagreed with wife's belief she needed "two nannies, a cook, and a couple of babysitters," as well as a personal assistant.

Nor is there any merit to wife's contention the court refused to acknowledge that husband was continuing to increase his earnings. The court considered both the $61,000 average a month husband made prior to separation and the stipulated $87,500 a month that he was making or was capable of making. Although it believed the "marital standard of living . . . is set at the date of separation" while "[t]he ability to pay is whatever it is now," the court expressly stated it took "the ability to pay into account." In particular, the court viewed the $87,500 per month that husband was making or was capable of earning insofar as "it impact[ed] on his ability to carry out the financial concordance of the court's order."

Moreover, a trial court is not required to consider a supporting spouse's postseparation income in awarding spousal support. (*Weinstein, supra,* 4 Cal.App.4th at p. 566.) Although "an increase in postseparation income may be considered for purposes of bringing the supported spouse's level of support up to that necessary to maintain the parties' marital standard of living[, w]here, as here, an award based on marital income level is sufficient to sustain the marital standard of living, there is no occasion to draw upon postseparation income. 'It is [the supported spouse's] needs which must be examined, not [the supporting spouse's] standard of living due to post-separation separate property earnings.' [Citation.]" (*Ibid.*) *In re Marriage of Ostler & Smith* (1990) 223 Cal.App.3d 33 [272 Cal.Rptr. 560], which wife cites, does not persuade us otherwise. That case merely held the trial court did not abuse its discretion in awarding additional support based on a percentage of the supporting spouse's future bonuses. (*Id.* at p. 50.)

Wife maintains that the court abused its discretion because the support order "leaves the parties at significantly different standards of living . . . ." But equality of postseparation income is not an element of section 4320 in setting spousal support. (See § 4320.) At best, the marital standard of living entitled wife to financial support commensurate with her lifestyle before she and husband separated. Although the law protected her from a precipitous drop in her standard of living after her divorce, it did not guarantee her dollar-for-dollar equality between her postseparation income and husband's. (*In re Marriage of Hoffmeister* (1987) 191 Cal.App.3d 351, 363 [236 Cal.Rptr. 543] [support award "must bear some relationship to the standard of living of the parties during their marriage and not the [postseparation] standard of living of the supporting spouse"].)

Wife's authorities do not demonstrate her income must equal husband's. In the decisions she cites, *In re Marriage of Andreen* (1978) 76 Cal.App.3d 667,

671–672 [143 Cal.Rptr. 94] and *In re Marriage of Ramer* (1986) 187 Cal.App.3d 263, 273 [231 Cal.Rptr. 647], superseded by statute on other grounds, as set forth in *In re Marriage of Romero* (2002) 99 Cal.App.4th 1436, 1441–1442 [122 Cal.Rptr.2d 220], the differences in postseparation income meant the difference between poverty for one spouse and relative comfort for the other. Wife's situation bears no similarity to the penurious state of the ill-supported spouses in *Andreen* and *Ramer*.

Wife asserts that because husband can afford it, she "should be allowed to live at the marital standard." But she has not demonstrated that the court's orders left her and the children "below the marital standard." The trial court set the marital standard of living to be $20,000 per month and determined that wife would be able to meet that standard "with a combination of child support, spousal support, and reasonable interest" from the assets awarded, along with the $3,000 monthly income imputed to her.

Taking these statements out of context, wife claims it was improper for the court to find some of her individual "needs would be satisfied by the payment of child support." The court never said that and wife has not cited any authority providing that child support may not be considered in determining whether the marital standard was met. Both section 4053 and *In re Marriage of Hubner* (1988) 205 Cal.App.3d 660 [252 Cal.Rptr. 428] involve guidelines for setting child support, not the marital standard of living.

Wife claims the court placed an "unfair burden, not contemplated by the law," on her to return to court if the amount of support awarded proves insufficient. The argument is apparently based on *In re Marriage of McNaughton* (1983) 145 Cal.App.3d 845, 852–853 [194 Cal.Rptr. 176], where the court noted the supporting spouse could seek a modification of spousal support after a reasonable period. But nowhere does it say the supporting spouse always has the burden to seek a modification of a spousal support order. Case law provides otherwise (see *In re Marriage of Winick* (1979) 89 Cal.App.3d 525, 531 [152 Cal.Rptr. 635] [trial court did not abuse its discretion in placing burden on supported spouse to seek modification of support if desired]), and wife has not explained why requiring her to seek a modification would deprive her of her day in court. In fact, it would give her yet another day in court.

### ii. *Imputation of Income*

Wife objects to the imputation of income to her from her share of the community property without considering outstanding debts and the purchasing of a residence in Newport Beach. The court considered such factors. Her claim that there was no substantial evidence showing "she would receive

income from her share of the community property" because the court did not consider her need to buy a home lacks merit.

Citing *In re Marriage of Kennedy* (1987) 193 Cal.App.3d 1633 [239 Cal.Rptr. 151], wife argues "the court must look to the actual, not theoretical, return on the property [she] receives." *Kennedy* did not did not say that. It believed the trial court had "overstepped its bounds by using a 10 percent return" but that it "would have been within the court's discretion to consider the rate of return earned on the balance of the property division after purchase of [a] home." (*Id.* at p. 1641.) Here, after considering wife's need to purchase a residence, the court imputed a 4.3 or 4.5 percent interest return on her assets because that was the government bond rate at the time. It did not require her to invest the assets or invade their principal. We find no abuse of discretion.

 Wife also challenges the imputation of income to her for the purpose of setting spousal support. The law is established "that a trial court may consider earning capacity in determining spousal support . . . ." (*Cheriton, supra*, 92 Cal.App.4th at p. 308.) A spousal support order requires the trial court to balance a number of different factors. (§ 4320.) One of these is "[t]he goal that the supported party shall be[come] self-supporting within a reasonable period of time." (§ 4320, subd. (*l*).) "[T]he weight to be given [this] factor [lies] within the trial court's broad discretion. [Citation.]" (*Cheriton, supra*, 92 Cal.App.4th at p. 308.) Another factor within the court's broad discretion is "[t]he ability of the supported party to engage in gainful employment without unduly interfering with the interests of dependent children in the custody of the party." (§ 4320, subd. (g).) The court considered this factor and found wife's earning capacity was not impaired by her domestic duties.

Wife argues the court erred by imputing income to her without "considering whether such was in the best interests of [the] children" under *Cheriton*. Wife acknowledges *Cheriton* was referring to child support (*Cheriton, supra*, 92 Cal.App.4th at p. 301), but she asserts the same considerations should be applicable to spousal support. They are not. "Unlike a child support order . . . a spousal support award does not require the court to consider the children's best interests. [Citation.]" (*Id.* at p. 308.) Moreover, unlike in *Cheriton*, the court here made express findings that the imputation of income was in the children's best interests.

*County of Yolo v. Garcia* (1993) 20 Cal.App.4th 1771 [25 Cal.Rptr.2d 681] does not support wife's argument the court abused its discretion in imposing an earning capacity on her. That case held that an award of restitution to the county for Aid to Families with Dependent Children (AFDC) benefits paid to

a mother could not be based on the mother's earning capacity during the period she was unemployed because she was the primary caretaker for her younger child and was thus exempt from seeking work under the AFDC statutes. (*Id.* at p. 1780.) No statutory exemption exists here.

Also baseless is wife's claim that she should be given a reasonable time to "fulfill her parental duties" before imputing income to her. The court gave her a reasonable time. No income was imputed to wife for seven and a half months and even then the spousal support was only reduced by $1,000. Wife has not demonstrated this was unreasonable.

### iii. *Step Down in Support*

In a related contention, wife asserts "there was no factual basis" for the orders stepping down support. The record shows otherwise.

The court premised its step-down order on evidence of wife's earning capacity, consisting of her testimony and the vocational examination report of Michael Bonneau. Wife testified she had completed law school and was taking refresher courses along with bar exam study courses. She hoped to "pass the bar, and then start looking for employment." If she did not pass, she intended to "look for work as a legal assistant." In his expert report, Bonneau opines that wife is "employable" and could earn between $2,080 and $3,560 per month as a paralegal. Alternatively, wife may pass the bar and seek employment as an attorney with a potential annual salary between $57,000 and $86,000 as a first year associate.

Wife complains she "was just about to turn 43, had completed her legal education ten years ago, . . . had not worked in the field[,] and had not passed the bar." She also claims "[t]here is no basis for finding [she] can obtain full-time employment" and "[b]oth . . . Bonneau's report and [her] own testimony support that her domestic duties would prevent that and would be a substantial obstacle to any employment." These same arguments were presented to, considered, and rejected by the trial court. We will not reweigh the evidence.

Wife maintains the trial court should not have presumed her law degree would "result in a substantially enhanced earning capacity as a matter of law." The court made no such presumption.

Wife questions how the court could consider a further stepdown in child support speculative and not consider it speculative for spousal support. The

comparison is inapt. Child support and spousal support have different purposes and are governed by separate statutes and guidelines. (Compare §§ 4050–4076 with §§ 4300–4360.) As noted above, one of the statutory factors the court must consider in awarding spousal support is "[t]he goal that the supported party shall be self-supporting within a reasonable period of time." (§ 4320, subd. (*l*).) No similar factor exists for determining child support. (See §§ 4050–4076.)

Contrary to wife's assertion, *In re Marriage of Andreen, supra*, 76 Cal.App.3d 667, did not reverse the step-down order dropping spousal support to $1 per month at the end of five years. (*Id.* at p. 672.) Nor does *In re Marriage of Regnery* (1989) 214 Cal.App.3d 1367 [263 Cal.Rptr. 243] require, as wife claims, a finding that the supported spouse should be employed full time before an earning capacity could be imputed. Rather, it stated an earning capacity may be imputed when there is an ability to work, a willingness to work, and "an opportunity to work which means an employer who is willing to hire. [Citations.]" (*Id.* at p. 1372.) These factors were met in this case.

Finally, section 4062, subdivision (a)(1) concerns child support. It has no application to spousal support.

### iv. *Termination of Support*

Wife also criticizes the court for setting a spousal support termination date. She argues termination after a long marriage is disfavored and cannot be based on speculation. But the cases she cites merely provide that before the court may order a date-certain termination of a spousal support order, there must be evidence in the record the supported spouse " 'would be able to provide for herself at that time.' " (*In re Marriage of Vomacka* (1984) 36 Cal.3d 459, 468 [204 Cal.Rptr. 568, 683 P.2d 248]; see *In re Marriage of Morrison* (1978) 20 Cal.3d 437, 454 [143 Cal.Rptr. 139, 573 P.2d 41]; see also *In re Marriage of Beust* (1994) 23 Cal.App.4th 24, 29 [28 Cal.Rptr.2d 201].) Such evidence existed here.

Wife asserts that the party seeking termination has the burden of justifying the spousal support termination order. That may be (see *In re Marriage of Prietsch & Calhoun* (1987) 190 Cal.App.3d 645, 660 [235 Cal.Rptr. 587]), but wife as the appealing party bears the burden of demonstrating the trial court abused its discretion. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 566 [86 Cal.Rptr. 65, 468 P.2d 193].) She has not done so.

### v. *Remaining Spousal Support Issues*

Wife is correct that tax consequences must be considered in awarding spousal support, but the record shows the court considered them. Also

without merit is her contention the court failed to consider "income from [an] apartment building which [husband] had apparently gifted to his parents and the $2,100 he received from another rental property . . . ." The only supporting evidence consists of husband's testimony that he "did a[n Internal Revenue Code section] 1031 exchange and purchased a . . . rental property," which gave him "[j]ust over $2,000 a month . . . ." At the hearing on wife's objections to the statement of decision, the trial court ordered the parties to meet and confer about revising the stipulated amount of income. Once that was done, the court agreed to modify the child support figure. Whether that was done is not part of the record. Regardless, the court did not fail to consider the income, as wife claims.

In her reply brief, wife asserts the trial court failed to consider additional factors. These issues require no discussion, however, because we need not consider new issues raised for the first time in a reply brief in the absence of good cause, and wife has not shown any. (*Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 766 [60 Cal.Rptr.2d 770].)

### b. Child Support

Although wife purports to challenge the child support orders along with the spousal support orders, she has not claimed the child support award was insufficient. Even if such a claim was buried in her brief, no error has been shown.

Section 4057, subdivision (a) states, "The amount of child support established by the formula provided in subdivision (a) of Section 4055 is presumed to be the correct amount of child support to be ordered." The trial court calculated child support pursuant to section 4055. Wife failed to carry her burden of showing the court misapplied the formula or that the application of the formula was unjust or inappropriate. (§ 4057, subd. (b).)

### 4. Miscellaneous

Throughout the brief, wife raises several conclusory or cursory claims that are not properly briefed because they are not supported by authority or reasoned legal argument or both. As a result, those issues are waived. (*Evans v. Centerstone Development Co.* (2005) 134 Cal.App.4th 151, 165 [35 Cal.Rptr.3d 745].)

## DISPOSITION

The judgments are affirmed. Respondent shall recover his costs on appeal.

Sills, P. J., and Aronson, J., concurred.

A petition for a rehearing was denied January 23, 2007, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied March 14, 2007, S149989.