Filed 9/24/25  Marriage of Tom CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| In re the Marriage of CAROL and BRANDON TOM. | B342764 (consolidated with B344394) |
| CAROL TOM et al. | |
| Appellants, | (Los Angeles County Super. Ct. No. 21PSFL00870) |
| v. | |
| BRANDON K. TOM, | |
| Respondent. | |

APPEALS from orders of the Superior Court of Los Angeles County, Kenneth M. Fuller, Judge.  Affirmed in part, reversed in part, and dismissed in part.

Cage & Miles and John T. Sylvester for Appellant Carol Tom.

Jaclin Awad, in pro. per., for Appellant Jaclin Award.

Law Office of Leslie Ellen Shear and Julia C. Shear Kushner for Respondent.

# INTRODUCTION

Carol and Brandon Tom stipulated to a marital dissolution judgment which granted them joint physical and legal custody of their two children. After dissolution, Carol[1] lived in Walnut with her mother and Brandon lived in nearby Rowland Heights. Carol homeschooled the children and had more custodial time than Brandon, but Brandon's share was substantial.

When the children were eight and six years old, Carol decided to move to Chula Vista, approximately 120 miles away, to live with her fiancé. She filed a request for order (RFO) seeking court permission to have the children relocate along with her and that she continue to homeschool them. Brandon opposed the move-away request. He also filed his own RFO seeking primary physical custody if Carol relocated and permission to enroll the children in a traditional[2] public school, and a separate RFO seeking an equal timeshare under a so-called "2-2-5" plan if Carol abandoned her plan to move away.

After a lengthy and ofttimes contentious evidentiary hearing, the court denied Carol's move-away request and denied Brandon's request for primary physical custody. During the hearing, Carol testified in response to her attorney's questioning that if the court denied her move-away request she would not move to Chula Vista. The court ultimately ordered a "2-2-5" custody plan akin to the one Brandon requested be implemented if Carol abandoned her planned move. The court ordered that if

---

[1] We use the parties' first names for clarity and the reader's ease, and not out of any disrespect.

[2] By "traditional" school we refer to in-person education, as opposed to student participation by remote means.

Carol changed her mind and ended up moving to Chula Vista, she could continue to exercise her equal timeshare, including at her mother's home. The court granted Brandon's request to have the children placed in a traditional public school. The court also granted sanctions against Carol and her trial attorney, Jaclin Awad, for their conduct during the hearing.

Carol challenges the rulings against her on various grounds, and Awad challenges the sanctions award against her. We find no reversible error in the court's physical custody order. We dismiss as moot Carol's appeal from the order regarding school enrollment because it is no longer the governing order on that issue, as Carol subsequently sought and received court permission to implement a different school choice. With regard to the sanctions orders, we affirm the award of sanctions made against Carol pursuant to Family Code[3] section 271, and reverse the sanctions order made against Awad pursuant to Code of Civil Procedure section 177.5.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. The Parties' Marriage

Carol and Brandon married in August 2013 and separated in December 2020. They had two daughters, born in May 2016 and May 2018.

### B. The Stipulated Judgment of Dissolution

Pursuant to a stipulated judgment of dissolution, which was entered by the court on March 16, 2023, Carol and Brandon shared joint legal custody of the children and joint physical

---

[3] Subsequent unspecified statutory references are to the Family Code.

custody split 55 percent to Carol and 45 percent to Brandon.  The judgment stated Carol's and Brandon's "intent and agreement . . . that the minor children shall continue to be homeschooled for as long as possible."

## C.    The Parties Both Live in the Los Angeles Area

After dissolution, Carol and Brandon lived in the Los Angeles metropolitan area, about 10 minutes apart.  Brandon lived in Rowland Heights with his parents, while Carol lived in Walnut with her mother.  Brandon worked as a detective for the Los Angeles County Sheriff's Department; Carol homeschooled the children and did not work outside the home.

## D.    Carol Announces She Might Move Away and Brandon Files an RFO in Response

In a November 16, 2023 phone conversation, Carol informed Brandon she intended to move away with the children to San Diego or Arizona after May 2024.

On December 7, 2023, Brandon filed an RFO seeking, in relevant part, to change primary physical custody from Carol to Brandon in the event Carol moved to San Diego or Arizona, and for permission to enroll the children at Blandford Elementary in the Rowland Unified School District or alternatively in the Walnut Unified School District.

Brandon contended that were Carol to move to San Diego or Arizona, it would be in the children's best interest to stay in the Los Angeles area and live with him because: if the children moved with Carol they would be displaced from their extended family, their friends, and their activities; it would isolate the children from Brandon because as a practical matter it would be very difficult for Brandon to regularly visit the children far away from Los Angeles; and Carol was planning to move in with a new

4

boyfriend and it would be a "strange environment" for the children to live in. Brandon suggested that Carol, who was not employed and had free time, could travel to her mother's house for extended visits with the children. Brandon contended that it would be best for the children to discontinue homeschooling and "be enrolled in a structured in-person school environment taught and run by people qualified in the field of education" and that "it [wa]s critical for them to learn alongside peers (children their own age and educational level) and away from parents to build independence, socialize and develop friendships and relationships."

On March 22, 2024, Carol filed an opposition asserting that Brandon's RFO was premature because she had not yet decided whether to move. The parties later agreed to continue the hearing on Brandon's RFO.

### E. Brandon Files an RFO to Modify Custodial Time in the Event Carol Does Not Move Away

On May 7, 2024, Brandon filed an RFO in which he sought, in relevant part, that in the event Carol did not move away the custody plan be modified so that he and Carol would have an equal timeshare under a "2-2-5" schedule.[4]

---

[4] Brandon proposed a repeating two-week schedule where the children would be with him Monday and Tuesday, Carol Wednesday and Thursday, and the parties would alternate Friday to Sunday, such that each parent would effectively have five continuous days of custody when it was their weekend.

**F.    Carol Files an RFO to Grant Her Full Physical Custody and to Permit Her to Move the Children to Chula Vista**

On June 7, 2024, Carol filed an RFO seeking full physical custody and for authorization to move with the children to Chula Vista.

In a declaration, Carol averred she had become engaged to her boyfriend and intended to move into his house in Chula Vista.  She asserted that she had always been the children's primary caregiver, and that because of Brandon's inconsistent work schedule the parents had agreed to visitation on a month-by-month basis with the result that Brandon generally had the children two to three days per week.  Carol suggested that Brandon could have visitation on alternate weekends (Friday through Monday) which would give him a timeshare "substantially similar" to his then-current one.  Carol asserted the approximately 120-mile distance between Brandon's home and Chula Vista was "minimal."

Carol desired to continue homeschooling the children and stated if they moved with her the children would continue to participate in a homeschooling support group in Chula Vista, which "supplements the social aspects of schooling that traditional homeschooling lacks."

**G.    Brandon Requests a Child Custody Evaluation and an Evidentiary Hearing**

On July 30, 2024, Brandon requested a child custody evaluation by a court-appointed expert and an evidentiary hearing on the custody, visitation, and schooling issues presented by the competing RFOs.  The court ordered the Los Angeles Superior Court's Family Court Services arm to prepare a

parenting plan assessment. In her report,[5] the evaluator recommended that Carol's move-away request be granted, Carol continue to homeschool the children, Carol and Brandon continue to have joint legal custody, and Carol be granted primary physical custody. The evaluator recommended that Brandon have custodial time every other weekend from Friday around midday until Tuesday morning.

## H.     The Evidentiary Hearing

The family court held an evidentiary hearing beginning on October 22, 2024. At the outset, Brandon indicated he would accept the court-appointed evaluator's recommendations as is. Carol indicated she would not agree because she opposed Brandon having the children until Tuesday morning on his weekends, and instead now wanted the court to order Friday through Sunday (a shorter timeframe than her RFO had requested) "because [Brandon]'s never spent four nights with the children." Carol asserted that she had always been the children's primary caretaker. Carol also requested tie-breaking authority for purposes of legal custody, contending that Brandon had made unilateral decisions and taken actions to undermine the children's homeschooling.

Brandon responded that Carol had engaged in "gatekeeping" to limit his time with the children and had attempted to alienate him from the children. Brandon refused to agree to the custody schedule advocated by Carol. In addition, he opposed granting Carol tie-breaking legal custody authority.

---

[5] Given the confidential nature of the child custody evaluation report (§§ 3025.5, 3111), we limit our public discussion of it to the extent permitted by law.

7

### 1. *Brandon's Testimony*

Brandon testified his percentage of custodial time varied, but in the last year the children stayed with him 13 to 14 days per month; this included about eight nights plus additional day visits. Brandon worked full time and substantial overtime and only had visitation with the children during his time off; Carol exercised her right of first refusal for times when Brandon was working. Brandon had recently been promoted and now had more control over his schedule and could perform some work at home. If Brandon was unavailable, his parents, girlfriend, sister and brother-in-law, and friends could take care of the children.

Brandon believed that if Carol moved with the children, his custodial time would substantially change and his quality time with the children would be reduced.

Brandon opposed the children being homeschooled; he believed that public schooling was better for the children because they needed social exposure to other teachers and friends. Brandon asked Carol for progress reports regarding the children's education, but she stated there were no reports. Brandon believed that him having primary custody would be best for the children because they would be in the Rowland Heights/Walnut area where they grew up, and where their paternal grandparents and aunt and uncle lived, as well as their maternal grandmother and relatives, and about 10 friends.

The older child was involved in swim classes and had been accepted to the local swim team, and the younger child was in gymnastics classes. Both children looked forward to these extracurricular activities.

2.     *Carol's Testimony*

Carol testified that she wanted to move to Chula Vista because her spousal support would soon end and because she and the children needed their own home. Carol was planning to live with her fiancé at his house. She had no family or friends in the area other than her fiancé. Her fiancé worked as a public high school vice principal; he moved to Chula Vista in 2019 and did not have any family in the area, but had a social network through his church.

Carol's contingency plan, if she became ill or unavailable, was for her mother (who remained in Walnut) to take care of the children. Carol also mentioned her church community, which was in the Los Angeles area, and her fiancé as potential caregivers. Carol did not believe the children had consistent friendships outside of homeschooling; the older daughter had just started on the swim team, and the younger daughter would have to move to a new program anyway. According to Carol, the children did not have consistent contact with other friends.

Carol believed the children should continue with homeschooling through at least elementary school. She planned to continue homeschooling through the same organization they had been with in the Los Angeles area. The children had social activities through weekly meetings with other children in the homeschool program and there were occasional field trips through the program. In addition, Carol arranged for the children to hang out with other kids their age. The children also interacted with their peers at church.

There were no standardized tests in the homeschool program. Carol understood that in public school students begin testing at the end of the third grade.

9

When asked how she envisioned the children being able to participate in extracurricular activities on a consistent basis, Carol responded, "To be honest, I haven't completely thought that far. But I also know that based on what [Brandon] and I have been able to work out in our texts, our flexibility, especially with homeschool, it does give them the option to go over for two to three nights on a weekday should they have a particular game that week. This is what I have thought about. I don't know realistically what it would look like." Carol rested after her testimony.

3.      *The Family Court's Tentative Impressions*

In response to Brandon's request, before the parties gave closing arguments the family court indicated its tentative "impressions" regarding the RFOs, which were to deny Carol's move-away request and order that the children be enrolled in traditional public school.

4.      *Carol's Rebuttal Evidence*

After the court stated its tentative inclination, it permitted Carol to present additional evidence. Carol first examined the court-appointed evaluator.[6] She then further examined Brandon regarding the options for the children to continue with their extracurricular activities, whether he preferred the children to attend a public or private school, and whether he believed it

---

[6] The family court ultimately found "that the evaluator's background, training, and experience was lacking" and indicated it would not "defer to her ultimate conclusion." Carol does not challenge this aspect of the court's ruling, and thus we do not summarize the evaluator's testimony.

10

would be in the children's best interests to attend a private school in the Chula Vista area instead of a public school in his area.

Lastly, Carol testified that she had researched two private schools and one public hybrid school in the Chula Vista area. In addition, Carol had found gymnastics and swim training/team options in Chula Vista. In response to questions from her attorney, Carol testified that if the court ultimately did deny her move-away request, "[she] would have no choice but to have to stay [in Los Angeles] and most likely, for the time being, live separately from [her] husband-to-be."

## I. The Court's Ruling

In a detailed 19-page, single-spaced minute order dated November 15, 2024, the court denied Carol's RFO for permission to move away with the children, modified the parenting plan in response to Brandon's RFOs, and granted Brandon's request to have the children enrolled in traditional public school.

Believing Carol to be the custodial parent, the court first found that Brandon had overcome the presumption under section 7501, subdivision (a) in favor of the primary custodial parent's decision to move with the children by showing the move would be detrimental to the children. Later portions of the court's order indicate that this detriment included disrupting the children's existing social circle, which included extended family and friends, their church, and their sports teams and other extracurricular activities; and that although the children were well bonded with Brandon, Carol had been "attempting to maintain as much control over the children as possible to the exclusion of [Brandon]," which a move-away would only exacerbate, such that "[i]t would be a detriment to the children to lose substantial

11

contact with [Brandon], because he appears to have a virtually equivalent role in their lives."

The court then turned to evaluating what was in the children's best interests. The court found Brandon's testimony was "credible and consistent," and that "[Brandon's] paramount concern was the best interests of the children over his own." It found Carol's testimony was "contradictory and conflicted," and that she "had [not] fully contemplated the consequences of her decisions." The court stated that Carol "had [not] researched how extra-curricular activities would practically be possible, particularly sports, in an arrangement where she and [Brandon] would be geographically remote."

Applying the factors articulated by *In re Marriage of LaMusga* (2004) 32 Cal.4th 1072 (*LaMusga*),[7] the court concluded that the children "[r]emaining here in Los Angeles would foster stability and continuity and allow more contact between the children and both parents." It next found that the distance to

_____

[7] Under *LaMusga*, "Among the factors that the court ordinarily should consider when deciding whether to modify a custody order in light of the custodial parent's proposal to change the residence of the child are the following: the children's interest in stability and continuity in the custodial arrangement; the distance of the move; the age of the children; the children's relationship with both parents; the relationship between the parents including, but not limited to, their ability to communicate and cooperate effectively and their willingness to put the interests of the children above their individual interests; the wishes of the children if they are mature enough for such an inquiry to be appropriate; the reasons for the proposed move; and the extent to which the parents currently are sharing custody." (*LaMusga*, *supra*, 32 Cal.4th at p. 1101.)

Chula Vista was "substantial" and the amount of time the children would spend commuting between parents was not in their best interests. The court found the children's young age meant it would be preferable to transition them to traditional school now, as opposed to in their teenage years, when they would likely be less emotionally stable. The court indicated that both parents had excellent relationships with the children, so this factor was neutral. The court found that Carol and Brandon had a "healthy, cooperative relationship," although it had suffered during the recent conflict. The court did note its concern, however, that Carol was putting her own interests above the children's interests by seeking to move them to Chula Vista. The court "f[ou]nd[] that both parents are substantially sharing custody in this case, that both parents are exposed to the children consistently and have quality time with the children."

The court found that if the children were to move to Chula Vista, "it is more likely than not that, over time, coordinating extracurricular activities, such as sports on the weekends, would not be viable given the fact that the children would, in all likelihood, miss at least half or close to half of the practices or competitions for any sports activities that they are engaged in. The children are engaged in gymnastics and swimming currently and will likely be engaged in extra-curricular activities that are crucial to their development in the future." It further found that "[i]f [Brandon] . . . were relegated to only half of the weekends, over time it is more likely than not that the children will become tired and potentially resentful of having to drive two hours to Los Angeles when they could otherwise spend time with friends or attend their extracurricular activities, such as sports, in their city of residence."

The court ordered that the children be enrolled in public school in Rowland Heights in January 2025, finding, "the children would benefit from the socialization that traditional school provides. It would provide the opportunity for the children to be instructed by someone outside of their family. It would provide the interaction with their peers that is necessary for proper social development. It would provide the opportunity to compete with peers for achievement and to be motivated by their peers in matching their achievements. It also provides the opportunity for the children to be exposed to a diversity of people of various backgrounds, cultures, and vocational levels and creeds. Homeschooling simply does not afford, in this instance, an opportunity to be equally exposed to a diversity of figures in their life, such as, different types of instructors and different types of students in the classroom." The court further observed that it was difficult to assess the children's achievement in homeschooling in a neutral and reliable way.

Effectively granting the relief requested by Brandon's second RFO, the court ordered custody divided equally between Carol and Brandon, each having custodial time for two weekdays, and alternating weekends (Friday morning through Monday morning). It awarded Carol and Brandon joint legal and physical custody of the children. The court ordered that if Carol, despite her representation that she would not move if her move-away request was denied, did "mov[e] to Chula Vista herself, then she would be expected to meet her obligations to have parenting time with the children by traveling to Los Angeles and spending time with the children either here with her parent or by transporting them to Chula Vista herself."

14

**J.  The Court Issues an Order to Show Cause Regarding Sanctions**

In its November 15, 2024 minute order, the court stated, "[it had] received an initial estimate of approximately six hours for th[e] case, two half days, two afternoons.  Th[e] case ultimately took 12 to 15 hours to litigate."  The court described that as "unreasonable" and "observed that [Carol's trial] counsel [Awad] did not adhere to the time estimates that were voiced."  The court further stated that Awad "repeatedly interrupted the court when making its findings and used an aggressive, disrespectful tone on repeat occasions.  At one point, the bailiff had to admonish [Awad] and intervene given how aggressively she was interrupting the court when she found out that the court's tentative rulings were not in line with her client's position."  The court set an order to show cause regarding sanctions against Carol under section 271 and against Awad under Code of Civil Procedure section 177.5.

**K.  Carol Requests a Statement of Decision and then Appeals**

On Friday, November 22, 2024, Carol filed a request for a statement of decision, listing 24 issues to be addressed.  The following Monday, November 25, 2024, Carol filed a notice of appeal of the court's November 15, 2024 order (case No. B342764).[8]  The court did not respond to Carol's request for a statement of decision.

---

[8] Carol also filed a petition for writ of mandate challenging the family court's November 15, 2024 order, which we summarily denied.  (Case No. B342890, filed Dec. 26, 2024.)

**L.    After Holding a Hearing, the Court Sanctions Carol and Awad**

On December 19, 2024, the court held a hearing on its order to show cause regarding sanctions.  Brandon's counsel requested the court award Brandon $35,000 in section 271 sanctions.  After the hearing, the court took the matter under submission.

On December 30, 2024, the court issued an order under section 271 that Carol pay $9,000 in sanctions to Brandon and an order under Code of Civil Procedure section 177.5 that Awad pay $999 in sanctions to the court.  We discuss the court's sanction orders more fully below.

Carol and Awad appealed the sanctions orders (case No. B344394).  We consolidated Carol's two appeals and Awad's appeal.

## DISCUSSION

**A.    Standard of Review for Custody and Visitation Orders**

"The standard of appellate review of custody and visitation orders is the deferential abuse of discretion test.  [Citation.]  The precise measure is whether the trial court could have reasonably concluded that the order in question advanced the 'best interest' of the child.  We are required to uphold the ruling if it is correct on any basis, regardless of whether such basis was actually invoked."  (*In re Marriage of Burgess* (1996) 13 Cal.4th 25, 32.)  "[I]n determining whether the trial court has abused its discretion, we first determine de novo whether the trial court applied the correct legal standard when exercising discretion."  (*In re Marriage of Mullonkal & Kodiyamplakkil* (2020) 51 Cal.App.5th 604, 613.)

16

The family court's factual determinations are reviewed for substantial evidence. (*In re Marriage of Fajota* (2014) 230 Cal.App.4th 1487, 1497.) However, Carol's appellate briefing states that she "does not raise any claim of substantial evidence." Instead, she accepts the court's factual findings and claims error based only on "pure questions of law."

**B.     The Denial of Carol's Move-away Request**

1.     *Applicable Legal Principles*

Where a "custodial parent" as defined by section 7501 plans to move away with the children, "the noncustodial parent bears the initial burden of showing that the proposed relocation of the children's residence would cause detriment to the children, requiring a reevaluation of the children's custody. . . . If the noncustodial parent makes such an initial showing of detriment, the court must perform the delicate and difficult task of determining whether a change in custody is in the best interests of the children." (*LaMusga*, *supra*, 32 Cal.4th at p. 1078.)[9]

As the court explained in *LaMusga*, "this area of law is not amenable to inflexible rules. Rather, we must permit our superior court judges . . . to exercise their discretion to fashion orders that best serve the interests of the children in the cases before them. Among the factors that the court ordinarily should consider when deciding whether to modify a custody order in

_____

[9] The family court considered Carol to be the custodial parent even though both parents shared significant custodial time. Brandon argues whether the court was right on this issue does not impact the ultimate correctness of its ruling. We agree and therefore accept for purposes of argument that Brandon was a noncustodial parent for purposes of section 7501.

17

light of the custodial parent's proposal to change the residence of the child are the following: the children's interest in stability and continuity in the custodial arrangement; the distance of the move; the age of the children; the children's relationship with both parents; the relationship between the parents including, but not limited to, their ability to communicate and cooperate effectively and their willingness to put the interests of the children above their individual interests; the wishes of the children if they are mature enough for such an inquiry to be appropriate; the reasons for the proposed move; and the extent to which the parents currently are sharing custody." (*LaMusga, supra*, 32 Cal.4th at p. 1101.)

" '[T]he paramount need for continuity and stability in custody arrangements—and the harm that may result from disruption of established patterns of care and emotional bonds with the primary caretaker—weigh heavily in favor of maintaining ongoing custody arrangements. [Citations.]' " (*LaMusga, supra*, 32 Cal.4th at p. 1093, quoting *In re Marriage of Burgess, supra*, 13 Cal.4th at pp. 32-33.) However, "bright line rules in this area are inappropriate: each case must be evaluated on its own unique facts. Although the interests of a minor child in the continuity and permanency of custodial placement with the primary caretaker will most often prevail, the trial court, in assessing 'prejudice' to the child's welfare as a result of relocating even a distance of 40 or 50 miles, may take into consideration the nature of the child's existing contact with both parents— including de facto as well as de jure custody arrangements—and the child's age, community ties, and health and educational needs." (*In re Marriage of Burgess, supra*, 13 Cal.4th at p. 39.)

"The likely impact of the proposed move on the noncustodial parent's relationship with the children is a relevant factor in determining whether the move would cause detriment to the children and, when considered in light of all of the relevant factors, may be sufficient to justify a change in custody." (*LaMusga*, *supra*, 32 Cal.4th at p. 1078.)

2. *The Family Court Did Not Abuse its Discretion in Denying Carol's Move-away Request*

a. Carol's claim the court failed to assume she would move away.

Carol contends the family court erred because it failed to assume that she would move whether or not the court approved her move-away request. "[A] court must not issue . . . a conditional order [changing physical custody in the event the custodial parent moves away] for the purpose of coercing the custodial parent into abandoning plans to relocate. Nor should a court issue such an order expecting that the order will not take effect because the custodial parent will choose not to relocate rather than lose primary physical custody of the children." (*LaMusga*, *supra*, 32 Cal.4th at p. 1098.)

"We presume the trial court knew and properly applied the law absent evidence to the contrary." (*McDermott Will & Emery LLP v. Superior Court* (2017) 10 Cal.App.5th 1083, 1103.) On this record, we cannot conclude that the court failed to assume, for purposes of its ruling, that Carol would be living in Chula Vista or that it issued its ruling to coerce her to abandon her plans to move. First, the court's detailed minute order articulated multiple reasons why it found moving away would be detrimental to the children and not in their best interests: moving would displace the children from the area where they had

19

grown up and where they had established familial and social relationships, whereas they had no connection to Chula Vista; the distance between Los Angeles and Chula Vista was "substantial" and it was not in the children's best interests to make the long trip at a minimum every other weekend as Carol suggested; "coordinating extracurricular activities . . . would not be viable" were the children to move to Chula Vista, and Carol had failed to propose any solution to this problem; if the children moved to Chula Vista with Carol their relationship with Brandon would suffer significantly; and Carol had "attempt[ed] to maintain as much control over the children as possible to the exclusion of [Brandon]." We decline to find, contrary to the court's expressed reasons, that its decision was not based on what it concluded was in the children's best interests if the children followed Carol when she moved to Chula Vista versus staying in Los Angeles with Brandon.

Carol relies on the court's statement in its ruling, "if mother in this case insists on herself moving to Chula Vista, that in the interim she may transport herself to her existing residence at her mother's house in Los Angeles County to exercise her custodial time during the period allotted to her. This would be a stop-gap solution between now and when perhaps mother and fiancé could relocate to an area closer to Rowland Heights or Walnut."

While the court did mention that Carol could move closer to the Rowland Heights-Walnut area, it did not do so to pressure Carol but instead to respond to evidence that Carol herself had introduced. Carol had testified, in response to questioning from her attorney, that if the court denied her move-away request "[she] would have no choice but to have to stay [in Los Angeles]"

20

and when asked by her counsel, "If the court were to order, for example, you can move away with the children but to a shorter distance, . . . is that an option that you're willing to explore?" she responded, "We are willing to explore, yes." Under these circumstances, the court's reference to Carol either not moving or potentially moving closer to Los Angeles addressed a contingency that Carol herself raised, and does not show that its ruling was based on an improper assumption or was designed to coerce Carol to move to a closer location.[10]

More fundamentally, Carol's argument elevates form over substance and ignores that Brandon filed two RFOs, one of which was to modify the custody plan if Carol abandoned her plan to move away. There was no point for the court, when it denied the move-away request, to also make an order taking away Carol's custodial time because the kids would remain in Los Angeles, only to then moments later supersede that order when it turned to adjudicate Brandon's May 7, 2024 RFO. The court analyzed the appropriate custodial arrangement assuming Carol moved to Chula Vista, and decided it would not permit the children to relocate with her. Carol had testified, at the request of her

_____

[10] In her reply brief, Carol for the first time argues that other comments made by the court show it failed to assume she would be moving to Chula Vista. Carol has forfeited these arguments. (See *Varjabedian v. City of Madera* (1977) 20 Cal.3d 285, 295, fn. 11 ["Obvious reasons of fairness militate against consideration of an issue raised initially in the reply brief of an appellant"].) Furthermore, even were we to consider these statements, we would not conclude that any of them show the court failed to apply the appropriate presumption that Carol would move to Chula Vista when deciding her move-away request.

counsel, that if the kids would not move to Chula Vista along with her she was not going to move. Under these circumstances, the court could properly proceed to consider Brandon's May 7, 2024 RFO seeking an equal timeshare in the event Carol did not move away as that RFO was being adjudicated in conjunction with Brandon's December 7, 2023 RFO, and Carol's June 7, 2024 RFO.

Carol cites *Jacob A. v. C.H.* (2011) 196 Cal.App.4th 1591, but that case is distinguishable. There, the Court of Appeal concluded the trial court improperly failed to assume the mother would move to Washington state because the record showed the court had instead assumed the mother would not move if her request were denied. Evidence of this included that "[i]n issuing its order, the trial court determined it was in [the child]'s best interests to continue having 'frequent interaction with both parents,' " a result the appellate court noted "[wa]s no longer possible." (*Id*. at p. 1601.) It also included the lower court's response, when asked by the child's counsel whether the court had an order on custody if the mother in fact moved to Washington state, " 'Well, I think I would cross that bridge when we come to it.' " (*Id*. at p. 1602.) The appellate court also noted that both the court-appointed mediator and counsel for the child failed to address whether it would be in the child's best interests to move with the mother or stay with the father if the mother moved, and "[b]y beginning their analysis with the assumption that [the] mother would not relocate without [the child], and persuading the trial court of the same, [the mediator and the child's counsel] created a scenario whereby an order maintaining the status quo was not only viable but preferable, even though

22

such an order is legally unsound given the circumstances." (*Id.* at p. 1602.)

In contrast, the family court's ruling in this case on the move-away request applied as if Carol was living in Chula Vista, the court did not make any statements indicating it had failed to consider whether it was in the children's best interests to move with Carol or stay with Brandon but instead analyzed that very question, and the court was not misinformed by counsel or the court-appointed expert about the proper analysis to apply.

Carol also relies on *Mark T. v. Jamie Z.* (2011) 194 Cal.App.4th 1115, another case where the Court of Appeal reversed a trial court's order denying the mother's move-away request. The case is similarly distinguishable because the trial court stated in its order, " '[the mother] did not testify she would leave [the child] here in San Diego and move back to Minnesota if the move away was denied' " (*id.* at p. 1128), raising the strong inference that its order was premised on an assumption that the mother would not move away if her request were denied. In addition, the trial court had adopted the analysis and recommendations of an evaluating psychologist who did not propose a parenting plan in the event the mother moved away. (*Ibid.*) Neither of these factors is present here.

> b.     Carol's argument the court failed to apply the correct legal standard.

Carol next asserts the family court failed to apply the correct legal standard because "the court's decision rested on conclusory findings that placing the children in Brandon's care would be 'beneficial' to the children." This mischaracterizes the court's order. As noted, in its order the court set forth, in detail, several reasons why it found moving away would be against the

23

children's best interests, including that it would jeopardize Brandon's relationship with them, uproot them from their social support and family network in Los Angeles, make extracurricular activities impracticable, and allow Carol to maintain control over them to the exclusion of Brandon. This analysis was proper under *LaMusga*.

Carol also argues that Brandon "had to show a significant change of circumstances outweighed the impact on the child of a change of custody from the primary custodial parent." This argument fails to acknowledge that a parent's move-away request constitutes changed circumstances. Under *Montenegro v. Diaz* (2001) 26 Cal.4th 249, when a custodial arrangement has been established in a final order such as the stipulated judgment in this case, the parent seeking to change the arrangement has the burden of showing "changed circumstance[s]." (*Id.* at p. 256.) However, the custodial parent's plan to move away with the children can constitute changed circumstances if the noncustodial parent shows the move would be detrimental to the children. (*LaMusga*, *supra*, 32 Cal.4th at p. 1096.) That is what the family court found in this case, and Carol makes no substantial evidence challenge to that finding.

Carol contends the family court erred by failing to consider the detriment that would be caused to the children were they removed from Carol's physical custody and, thus, according to Carol, "gave seemingly no consideration to 'preserving the established mode of custody' and the 'stable custody arrangements.'" (See *LaMusga*, *supra*, 32 Cal.4th at pp. 1088, 1101 [courts should consider "the children's interest in stability and continuity in the custodial arrangement"].) We disagree. First, although the court's order does not explicitly reference the

24

children's interest in maintaining a relationship with Carol, nothing in the order suggests the court did not weigh the detrimental impact on the children of having less time with Carol against the harm the children would suffer by moving away. (See *LaMusga*, *supra*, 32 Cal.4th at p. 1093 ["courts would do well to state on the record that they have considered this interest in stability, but the lack of such a statement does not constitute error and does not indicate that the court failed to properly discharge its duties"].) Second, the court did consider the children's interest in stability and continuity in their overall custodial situation. The court found that "[Brandon] ha[d] exercised substantial custodial time and, in light of, typical school hours and overnights, ha[d] spent considerable quality time with the children relative to [Carol]," and "appear[ed] to have a virtually equivalent role in the[ children's] lives when compared to [Carol] even though she has provided the primary instruction in the homeschooling program," and that Carol and Brandon "[we]re substantially sharing custody." Thus, in effect, the court concluded the children's interest in stability and continuity would be equally impacted whether they moved with Carol to Chula Vista or remained with Brandon in Los Angeles.

C.  **The Court's Order Granting Brandon's Request to Enroll the Children in Public School is Moot**

In his December 7, 2023 RFO, Brandon requested a modification of custody so that the children could be enrolled at Blandford Elementary School in Rowland Heights, or alternatively in the Walnut Unified School District, because it was in the children's best interests to attend a traditional school instead of being homeschooled. During the evidentiary hearing, Brandon reaffirmed he was seeking an order allowing him to

place the children in a traditional public school, specifically Blandford Elementary.  The court decided in favor of Brandon, stating in its November 15, 2024 order that it "concur[red]" with Brandon's assessment.  However, instead of modifying legal custody to grant Brandon sole or tiebreaking authority to decide which school the children should attend (see, e.g., *In re Marriage of Furie* (2017) 16 Cal.App.5th 816, 827 [order granting the mother sole authority to make decisions regarding the children's orthodontic care]), the court ordered, "the children are . . . to be enrolled and attend public school in Rowland Heights until further order of the court or written stipulation of the parties."

Carol contends the court acted in excess of its jurisdiction under the Family Code in ordering the children to attend public school in Rowland Heights because "[t]the court was required to select a parent to exercise legal custody."  As Carol points out, nothing in the Family Code provided the court with authority to order that the children attend a particular school.  One treatise explains that "[n]othing in the Family Code gives a family court . . . the power to make decisions for the child . . . .  The better practice, absent stipulation of the parents, is for the court order to determine which parent has the authority to make the decision, rather than what decision is made."  (Cal. Child Custody Litigation and Practice (Cont.Ed.Bar 2025) § 4.29; see also §§ 3022 ["The court may . . . make an order for the custody of a child during minority that seems necessary or proper"], 3048, subd. (a)(3) ["in a proceeding to determine child custody or visitation with a child, every custody or visitation order shall contain . . . [¶] . . . [¶] . . . [a] clear description of the custody and visitation rights of each party"].)  We agree this is the better practice, and one the court here should have followed.

26

Brandon contends that Carol's appeal from the court's school enrollment order is moot because that order was superseded by an order Carol obtained after her appeal. On December 4, 2024, Carol sought to modify the November 15, 2024 schooling order to have the children enrolled at Ybarra Academy of Arts and Technology, a public school in the Rowland Unified School District. According to Carol, Brandon was preparing to enroll the children in Blandford Elementary but she preferred Ybarra Academy for several reasons. On December 6, 2024, the court granted Carol's request, ordering that the children "be registered with [Y]barra [e]lementary [s]chool forthwith and . . . begin attending on January 1, 2025."

" 'A question becomes moot when, pending an appeal from a judgment of a trial court, events transpire which prevent the appellate court from granting any effectual relief.' " (*In re Marriage of Olson* (2015) 238 Cal.App.4th 1458, 1463.) We conclude that Carol's appeal of the November 15, 2024 school enrollment order is moot because even if we were to vacate that order, it would not change which school the children attend given the subsequent December 6, 2024 order. Carol suggests that we could grant her "effective relief by reversing the order and instructing the trial court to grant Carol legal custody to make the decision to return the children to homeschooling." We disagree. Carol does not contend in her appeal that the court should have granted her sole or tiebreaking legal custody on educational matters or generally, nor does she mount any challenge to the court's legal custody-related findings, which are incompatible with a ruling granting Carol sole or tiebreaking legal custody on educational matters. Therefore, Carol being granted sole or tiebreaking legal custody to generally decide

27

educational matters is not a possible result of her appeal. Accordingly, we dismiss Carol's appeal from the November 15, 2024 school enrollment order.[11]

## D. Carol's Request for a Statement of Decision

After the court issued its detailed November 15, 2024 minute order, Carol filed a request for a statement of decision under section 3022.3 and Code of Civil Procedure section 632.[12]

[11] We decline Carol's invitation to consider her claim, despite it being moot, because it involves an issue that is likely to recur. (See *In re Marriage of Olson*, *supra*, 238 Cal.App.4th at p. 1463 ["if ' "there is a distinct possibility that the controversy between the parties may recur" ' [citations], an appellate court may decide an issue that would otherwise be dismissed as moot"].) We are not persuaded that the issue will recur. Both parties agree, and we concur, on the form of relief the court should order in the context of educational matters. Thus, if further questions regarding school enrollment arise, we are confident that going forward the court will heed our admonition to "pick the picker" rather than directly ordering the implementation of a legal custody decision sought by a parent.

[12] Section 3022.3 provides that, "Upon the trial of a question of fact in a proceeding to determine the custody of a minor child, the court shall, upon the request of either party, issue a statement of the decision explaining the factual and legal basis for its decision pursuant to [s]ection 632 of the Code of Civil Procedure." While this language does not generally include "an order on a motion . . . even if the motion involves an evidentiary hearing and the order is appealable" (*City and County of San Francisco v. H.H.* (2022) 76 Cal.App.5th 531, 544), courts have recognized an exception in child custody cases, so that the statutes do apply in such proceedings even without a judgment after trial. (See *id.* at pp. 544-545.)

28

Carol filed her notice of appeal the following court day, and the court never responded to Carol's request. Carol contends the court reversibly erred in failing to issue a statement of decision.[13]

Although the family court erred in failing to prepare a statement of decision, the error is subject to harmless error review and Carol has failed to show prejudice. (*F.P. v. Monier* (2017) 3 Cal.5th 1099, 1108 ["a trial court's error in failing to issue a requested statement of decision is not reversible per se, but is subject to harmless error review"]; *City and County of San Francisco v. H.H.*, *supra*, 76 Cal.App.5th at p. 547, fn. 6 [failure to issue a requested statement of decision in a child custody proceeding subject to harmless error review].)[14] The court's

---

[13] Brandon contends the minute order "satisfied the requirements of a statement of decision" (fn. omitted) and that Carol has forfeited any challenge to the order by failing to object to it or file a motion for new trial or to vacate the order. We decline to find a forfeiture here. Carol requested a statement of decision, and she can therefore appeal the failure to receive one. Further, even though the minute order is in substance consistent with a statement of decision, procedurally it was akin to a "tentative decision" under California Rules of Court, rule 3.1590 (rule 3.1590), which provides that a party can request a statement of decision within 10 days of the announcement or service of a tentative decision. Brandon points out that under rule 3.1590(c) a court can state in a tentative decision that it is a proposed statement of decision (rule 3.1590(c)(1),(4)), but the court's minute order did not include any such statement.

[14] Carol asserts that harmless error analysis is precluded here under *Abdelqader v. Abraham* (2022) 76 Cal.App.5th 186. We disagree. In that case, the trial court found the presumption under section 3044 rebutted but failed to articulate any findings

lengthy minute order set forth in detail the reasons why it was denying Carol's move-away request, and granting Brandon's RFO for a 2-2-5 plan in the event Carol abandoned her plan to move away. Carol argues that without a statement of decision we are left "to speculate as to the reasons why the [family] court did what it did," but she fails to acknowledge the court's lengthy 19-page minute order, much less identify any issues that would have been addressed in a statement of decision that were left out of the minute order.[15] (See *Parris J. v. Christopher U.* (2023) 96

---

as required by section 3044, subdivision (b) explaining why the presumption was overcome. (*Abdelqader*, *supra*, at p. 197.) The appellate court found the failure to provide any such explanation was not harmless error. (*Id.* at p. 198.) Here, in contrast, the court extensively articulated the reasons for its rulings on the competing RFOs.

[15] For the first time in her reply brief, Carol identifies specific issues included in her request for a statement of decision that she contends addressed "pivotal issues in [her] appeal." Carol has forfeited any claim that the family court's failure to issue a statement of decision on these issues was prejudicial by failing to raise it in her opening brief. (*Varjabedian v. City of Madera*, *supra*, 20 Cal.3d at p. 295, fn. 11.) Furthermore, even if this claim was not forfeited, Carol has failed to demonstrate prejudice. A statement of decision must "explain[] the factual and legal basis for [the court's] decision as to each of the principal controverted issues" (Code Civ. Proc., § 632), and the court's minute order does so and provides an adequate basis for review of Carol's appellate claims. Carol has similarly forfeited her argument, also raised for the first time in her reply brief, that the failure to issue a statement of decision can constitute structural error not amenable to harmless error analysis. Even if this issue was not forfeited, we would reject Carol's claim because she fails

30

Cal.App.5th 108, 134-135 [failure to issue a statement of decision was harmless error where the appellant did not "clearly explain how he was prejudiced"].)

**E.    The Section 271 Sanctions Order Against Carol**

Carol contends the court erred in sanctioning her under section 271 because the conduct it relied upon was not sanctionable and the court failed to consider whether the sanction would impose an undue financial hardship on her.

> 1.    *Carol and Her Attorney Engaged in Sanctionable Conduct*

Under section 271, "the court may base an award of attorney's fees and costs on the extent to which any conduct of each party or attorney furthers or frustrates the policy of the law to promote settlement of litigation and, where possible, to reduce the cost of litigation by encouraging cooperation between the parties and attorneys."  (§ 271, subd. (a).)  Where a party's counsel engages in conduct violative of section 271, that section makes the party and not the attorney financially responsible for the consequences.  (*Id.*, subd. (c); see also *Burkle v. Burkle* (2006) 144 Cal.App.4th 387, 403-404, fn. 7.)

We review a section 271 sanctions order for abuse of discretion.  (*In re E.M.* (2014) 228 Cal.App.4th 828, 850.)  We reverse "such an order only if, considering all of the evidence

---

to set forth any basis for a finding of structural error.  (See *Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852 [appellate court may "treat [an] issue as abandoned" where a party makes a "conclusory presentation, without pertinent argument or an attempt to apply the law to the circumstances of this case"].)

viewed most favorably in its support and indulging all reasonable inferences in its favor, no judge could reasonably make the order." (*In re Marriage of Corona* (2009) 172 Cal.App.4th 1205, 1225-1226.)

The court imposed sanctions against Carol for being "unreasonable in her position regarding child custody and visitation." This conclusion was reasonable. For example, Carol's move-away RFO requested Brandon have alternating weekends; when she saw the recommendation of the court-appointed evaluator to give Brandon slightly more time, she responded by urging the court to grant Brandon even less time than she had requested in her RFO. The court's order specifically noted Carol's position in response to the recommendations of the court-appointed evaluator, and that she "not only demanded more, but stretched out the litigation of this matter from [one to two] half days to [six] days." In addition, the court found that Awad, Carol's attorney, "was openly rude to opposing counsel and the court during the hearing on repeat occasions," "talked over the court on numerous occasions despite being admonished not to do so," engaged in "unruly and uncivil behavior" which required "the courtroom bailiff . . . to intervene to maintain order," "impugned the integrity of the court," and "misrepresented facts on the record."

The court acted well within its discretion in concluding this conduct frustrated the policy of promoting settlement and reducing litigation costs. (See *In re Marriage of Davenport* (2011) 194 Cal.App.4th 1507, 1535-1536, fn. 17 [a party can be sanctioned under § 271 based on conduct by their attorney]; *In re Marriage of Greenberg* (2011) 194 Cal.App.4th 1095, 1100 [parties who " 'engag[e] in conduct that increases litigation costs

are subject to the imposition of attorneys' fees and costs as a sanction' " under § 271].) Carol simply fails to address the court's finding that she unnecessarily prolonged the litigation and frustrated settlement efforts by refusing to take a reasonable position, and instead litigated for hours seeking to shorten Brandon's custodial time by effectively two to three days a month.[16]

As for her counsel's conduct during the hearing, Carol argues that Awad was "passionate" and was merely advocating for her, and claims "section 271 is not designed to sanction rudeness." The latter claim is simply wrong. For example, in *In re Marriage of Davenport*, *supra*, 194 Cal.App.4th 1507, the appellate court upheld an award of sanctions where one spouse's attorney repeatedly used "abusive, rude, hostile, and/or disrespectful language." (*Id*. at p. 1534.) As the *Davenport* court noted, "It is bad enough that such [conduct] occurs in any litigation. It is utterly inconsistent with a fundamental aspect of proper family law practice. 'Family law cases are not supposed to be conducted as "adversarial" proceedings. Quite the contrary, the goal [of section 271 and other family law statutes] is to *reduce* acrimony and adversarial approaches common to general civil litigation and, instead, to foster *cooperation* between the parties and their counsel with a view toward settlement short of full-blown litigation.' " (*Ibid*.)

_____

[16] Carol's appellate brief wrongly claims the court did not ultimately find the duration of the hearing a basis for awarding section 271 sanctions. The court's order noted Brandon took reasonable positions, but that Carol not only took unreasonable ones "but stretched out the litigation of this matter from [one to two] half days to [six] days."

We further reject Carol's suggestion that zealous advocacy requires the type of untoward behavior Awad repeatedly demonstrated. "Zeal and vigor in the representation of clients are commendable. So are civility, courtesy, and cooperation. They are not mutually exclusive." (*In re Marriage of Davenport*, *supra*, 194 Cal.App.4th at p. 1537.) Here, the court could reasonably conclude Awad's incivility and rudeness, which escalated at one point to the bailiff being forced to intervene to maintain order, and at another point during a remote appearance to the court having to order the judicial assistant to mute Awad because of counsel's constant attempts to speak over the court, went beyond appropriate advocacy and frustrated the policy of promoting settlement by creating an antagonistic environment not conducive to compromise, and also increased litigation costs by distracting the court and parties from the merits of the dispute.

Lastly, we reject Carol's assertion that the court imposed sanctions because it was personally upset at being accused of bias. Carol relies on *Featherstone v. Martinez* (2022) 86 Cal.App.5th 775, where the Court of Appeal reversed a section 271 sanctions award based on its conclusion the trial court issued the award because it disagreed with the mother's litigation positions and was "miffed" because the mother had accused the court of bias. (*Id*. at p. 785 & fn. 8.) In this case, in contrast, the court sanctioned Carol based on findings that she and Awad had increased litigation costs by unnecessarily prolonging the evidentiary hearing and creating an environment not conducive to compromise. While the court's order noted that Awad had "impugned the integrity of the court," nothing in the record suggests the court sanctioned Carol based on a personal reaction

34

to any accusation of bias or that sanctions were not otherwise appropriate regardless of any accusation of bias.

2. *The Family Court Did Not Err in Awarding Sanctions against Carol Based on Ability to Pay*

Carol contends the court failed to consider whether the sanction it imposed against her imposed an unreasonable financial burden. Section 271, subdivision (a) provides, "In making an award pursuant to this section, the court shall take into consideration all evidence concerning the parties' incomes, assets, and liabilities. The court shall not impose a sanction pursuant to this section that imposes an unreasonable financial burden on the party against whom the sanction is imposed."

At the hearing, Carol argued that sanctions would impose an unreasonable financial burden on her because she was not receiving any income due to homeschooling the children. Brandon argued that Carol's ability to fund the lengthy custody and visitation hearing as well as to hire appellate counsel to continue challenging the court's ruling showed she had money to pay sanctions. Brandon represented that he had incurred more than $100,000 in fees during the previous year and sought $35,000 in sanctions. The court awarded Brandon about one quarter of that amount, $9,000.

The court did not address Carol's ability to pay in its order. Under these circumstances, we presume the court made an implied finding that $9,000 in sanctions would not impose an unreasonable financial burden on Carol. Carol argues that such a finding cannot be implied, but offers no analysis and the law is to the contrary. "Findings will be normally implied to support . . . orders if supported by substantial evidence." (*In re Marriage of*

*Ackerman* (2006) 146 Cal.App.4th 191, 197.)[17] Substantial evidence supports the finding that a $9,000 sanctions award would not pose an unreasonable financial burden on Carol. Carol was able to pay her trial counsel and appellate attorneys, and nothing suggested she restrained her litigation activity due to financial constraints. Carol points out that she had not been receiving income; however, the reason why she had chosen not to work—homeschooling the children—was no longer viable as the court had ordered the children to be placed in a traditional public school, and the court could reasonably conclude that Carol, who had a Bachelor of Arts degree in Mathematics, could find work.

More importantly, although Carol filed an income and expense declaration which showed a lack of income, she failed to provide any information regarding her assets, such as bank accounts and investments, stating on her declaration only that they were "TBD." Further, despite her claimed lack of income, her income and expense declaration listed four credit cards or other installment debts without any pending balance and stated she was current on all four. If Carol had wished to challenge her ability to pay any sanction award, she could have submitted a current and *complete* income and expense declaration. (*In re Marriage of Corona*, *supra*, 172 Cal.App.4th at p. 1227.) Instead, she submitted an incomplete income and expense declaration artfully omitting any information about her assets and other critical financial information. From this omission, the court was

_____

[17] As Carol acknowledges, no statement of decision was requested or required in connection with the sanctions order. Accordingly, prohibitions against implied findings in connection with statements of decision are inapplicable to the sanctions order.

entitled to infer that she had sufficient assets to pay the award. Accordingly, Carol "has not met [her] burden to show reversible error or an abuse of discretion in the sanctions order." (*Ibid.*)

**F.    The Sanctions Order Against Carol's Attorney**

The court sanctioned Awad $999 under Code of Civil Procedure section 177.5.  That statute provides courts with "the power to impose reasonable money sanctions, not to exceed fifteen hundred dollars ($1,500), notwithstanding any other provision of law, payable to the court, for any violation of a lawful court order by a person, done without good cause or substantial justification.  This power shall not apply to advocacy of counsel before the court." (Code Civ. Proc., § 177.5.)  We review an order imposing sanctions under Code of Civil Procedure section 177.5 for abuse of discretion.  (*People v. Ward* (2009) 173 Cal.App.4th 1518, 1527.)

Awad contends that the court erred because the record and the court's findings do not show she knowingly violated a valid court order.  We agree.

Code of Civil Procedure section 177.5 requires that "[a]n order imposing sanctions shall be in writing and shall recite in detail the conduct or circumstances justifying the order."  The court's written order failed to comply with this provision.  It detailed the conduct that supported its award of section 271 sanctions, but when it turned to Code of Civil Procedure section 177.5 the order said simply, "As to [such] sanctions, the court orders [Awad] to pay $999, payable to the Los Angeles Superior Court forthwith."

The court's Code of Civil Procedure section 177.5 sanction order further failed to identify any valid court order that Awad violated.  The court did find in connection with its imposition of

37

section 271 sanctions "that [Awad] talked over the court on numerous occasions despite being admonished not to do so." Awad undoubtedly did so.  But those admonishments all involved advocacy before the court, were never phrased as orders, and in any event were never identified as the basis for Code of Civil Procedure section 177.5 sanctions.  We in no way condone Awad's behavior, and as noted above it was properly sanctioned under section 271.  But viewed in context as part of the order made here, that conduct cannot support a sanction under Code of Civil Procedure 177.5.

## DISPOSITION

The court's physical custody and visitation order and its order imposing section 271 sanctions are affirmed.  The order imposing sanctions pursuant to Code of Civil Procedure section 177.5 is reversed.  Carol's appeal from the court's order regarding school placement is dismissed.  Brandon is awarded his costs on appeal.

NOT TO BE PUBLISHED


WEINGART, J.


We concur:



ROTHSCHILD, P. J.          BENDIX, J.