Filed 10/30/25

# CERTIFIED FOR PARTIAL PUBLICATION*

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re the Marriage of GLENN RUSSELL and KATHY SCHROEDER NELSON. | |
| GLEN RUSSELL NELSON, Appellant, v. KATHY SCHROEDER NELSON, Respondent. | G064256 (Super. Ct. No. 21D002013) O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Nancy Wieben Stock, Temporary Judge. (Pursuant to Cal. Const., art. VI, § 21.) Affirmed.

Law Offices of Thomas M. McIntosh, Tomas M. McIntosh; Law Offices of John J. Brunelli and John J. Brunelli for Appellant.

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part IV of the Discussion section.

Seastrom Tuttle & Murphy, Thomas W. Tuttle; Stephen Temko for Respondent.

\* \* \*

This is an appeal following a judgment in a marital dissolution case between Glen Nelson (Glen) and Kathy Nelson (Kathy).[1] Glen claims the court made numerous errors. First, he claims Family Code section 4360,[2] which expressly permits security for spousal support after death, violates section 4337, which states support terminates on death. Second, there was insufficient evidence to support such an order in this case. Third, security for support is a drastic remedy which was unmerited by the facts of this case. Finally, Glen claims the court abused its discretion by denying his motion to modify spousal support based on Kathy's alleged cohabitation.

With respect to the first argument, we find it has no legal merit based on long-established principles of statutory interpretation. As to whether security for support was warranted here, we conclude the evidence amply establishes the order was necessary and appropriate in this case. The third claim, that section 4360 is a "drastic remedy," appears to be an unfounded attempt to add nonstatutory elements to a court's required findings. It is without merit.

In the unpublished part of the opinion, we reject Glen's claim that the court abused its discretion by denying a posttrial request for an order to modify or eliminate spousal support.

---

[1] Due to common surnames, we refer to the parties by their first names. (*In re Marriage of Smith* (1990) 225 Cal.App.3d 469, 475–476, fn. 1.)

[2] Subsequent statutory references are to the Family Code unless otherwise indicated.

2

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

*A. Marriage, Separation, and Temporary Orders*[3]

The parties were married in 1984. A few days prior to their marriage, they entered into a premarital agreement. The parties later stipulated the premarital agreement was valid with the exception of the spousal support provision.

Glen filed for dissolution on April 2, 2021. According to Kathy, they separated on February 24, 2021. Thus, the marriage lasted over 36 years. They had one child who was no longer a minor.

In December 2021, the parties stipulated to temporary orders. Kathy was to be paid $19,000 a month for spousal support, from which she was to pay the mortgage on the family's Newport Beach home. She was also granted temporary possession of the home.

---

[3] Glen's briefing is problematic. Nearly his entire Statement of Facts cites to the register of actions as evidence of certain facts, but without the underlying documents, the register is not useful for establishing anything except the date a document was filed. We disregard facts with no pertinent record citation. (*Del Real v. City of Riverside* (2002) 95 Cal.App.4th 761, 768; *Schubert v. Reynolds* (2002) 95 Cal.App.4th 100, 109.)

Further, Glen's reply brief is organized very differently from his opening brief, and it appears to raise issues not discussed in his opening brief. This is improper, and any such issues are disregarded. (*Schubert v. Reynolds, supra,* 95 Cal.App.4th at p. 108.)

*B. Spousal Support Issues*

We limit our discussion of the issues at trial to those related to security for spousal support, which is the focus of this appeal. Trial began in a JAMS proceeding in October 2022.

Both Glen and Kathy briefed this issue prior to trial. Glen was 78 years old at that time, 13 years older than Kathy, and had no relevant life insurance policies. He estimated his net worth exceeded $24 million.

Kathy's brief stated she had a Bachelor's degree and an active CPA license. She worked from 1984 until 1989. Thereafter, she was primarily a stay-at-home mother and homemaker. Kathy was a caregiver for both of Glen's parents before they passed away. She also devoted time to Glen's health care needs, resigning from her job as a tax accountant in 1989 to provide Glen full-time care after cancer surgery. She later cared for him following another cancer surgery in 2010 and open heart surgery in 2011. Her more recent work experience had been informal, "serving as the family accountant, tax preparer, and chief financial advisor for the Nelson family businesses" from 1986 through 2020. She also worked part time as a seasonal tax preparer. She argued that at age 64, "[s]he would need years of additional practical experience and work history before becoming competitive in today's job market with a full-time position . . . ." Kathy contended that she will need to rely on spousal support for survival and to maintain the marital standard of living. She requested an annuity or security for support of $3.5 to $4 million.

Glen's brief contended that section 4360 only applied to the maintenance of existing life insurance policies, and there were none in the instant case. He then appears to concede the court can order security, stating without citation, that "[i]t is a rare, drastic, and unusual remedy," under

"very unique" facts. As relevant here, he then goes on to state that Kathy's share of the marital home, a car, and an IRA,[4] are "substantial assets," and contends Kathy knew of the age difference between them when they married. Kathy, Glen asserted, "should have anticipated that Glen (male) would die <u>at least</u> 13 years before she (female) dies." Glen urged the court to deny a security order.

During trial, a forensic accountant, Andrew Hunt, testified as to the amount of security that would be needed for different time periods and amounts of support. For example, support of $15,000 a month for 20 years would require $2.475 million in security, while $20,000 a month for the same period would require $3.3 million.

The parties filed closing briefs, and both addressed the issue of security for support.

The statement of decision, filed in June 2023, set forth the court's analysis on the issue of spousal support, and ultimately ordered Glen to pay Kathy $20,000 a month until the death of either party, Kathy's remarriage, or a further court order. The court found the marital standard of living was $29,635 per month. The marital home, without objection by Kathy, was awarded to Glen. Kathy also had roughly $1.2 million in investments.

The court's statement of decision also reflects a ruling in Kathy's favor on the security for support issue: "The circumstances of this case render a Family Code section 4360 order just and reasonable. Kathy will need to rely on spousal support the rest of her life. She has no capacity to ever support herself at or near the marital standard of living, otherwise. Glen leaves the marriage with a multi-million-dollar separate property estate and substantial

---

[4] The court later valued the IRA at $127,000.

5

investment income. There is a lack of any substantive community property estate. The only community property, given Glen's 2640 credits, is a partial interest in the family residence. Glen has a substantial separate property estate, with a net worth of close to $25 million, Kathy owns minimal assets. The interest she had in the investment accounts gifted to her by Glen, has diminished because of living expenses and high legal costs. Other than support, she has limited means to support herself in retirement."

The court also noted the substantial age and health differences between the parties. "[Glen], a two-time cancer survivor, is 78 years old. During the trial he was residing in an assisted living home, having suffered some health set-backs in the period leading to trial. H[is] condition was described as 'frail.'[5] Glen's Income & Expense Declaration shows he requires the assistance of 'Caregivers, 16 hours per day,' 3 days a week, and at one time it was 7 days a week. Kathy, who is turning 65 years old, is in excellent health. Kathy's actuarial life expectancy of 22 years is far greater compared to [Glen]'s. Kathy lacks any substantial earning capacity. At nearly 65 years old, she is already of retirement age and has been out of the fulltime workforce for decades. One reason she has been out of the workplace for so many years is her commitment to being a stay-at-home spouse and mother during her prime earning years."

The court further noted the lack of life insurance policies prior to stating that "section 4360 permits an order directing that security be provided in the form of the trust, counsel shall meet and confer on the timing

---

[5] Glen objected to this sentence when it appeared in the tentative opinion, but the court rejected his requested change to reflect that he was in "good health."

and form of the trust to be created or utilized to secure spousal support. The trust shall have assets, upon the death of Glen to provide monthly spousal support payments at the Court-ordered amount until statutory terminating conditions should occur, eliminating the obligation. In light of the support amount ordered in this decision, and Kathy's potential lifespan, the initial asset value should not be less than $3 million. This represents a reasonable asset value, to start the timeline of Glen and Kathy's respective timelines and considers that the likelihood of Glen's demise happening immediately is less than if it should happen in year nos. 3, 5 or beyond. Over time, if the asset value is deemed to exceed the reasonable obligation for future support, the Court retains jurisdiction to make amended orders."

The statement of decision was incorporated into a partial judgment. The judgment stated, in relevant part: "The Court orders security for spousal support pursuant to Family Code, §§ 4339 and 4360 in the form of a trust. . . . Counsel shall meet and confer on the timing and form of the trust to be created or utilized to secure spousal support. The trust shall have assets, upon the death of Husband to provide monthly spousal support payments at the Court-ordered amount until statutory terminating conditions shall occur, eliminating the obligation. Any unpaid sums upon a terminating condition, such as Wife's death, would revert to the trust and be owned by the person(s) or entity(ies) designated by Husband's estate. In light of the support amount ordered in this Judgment and Wife's potential lifespan, the initial asset value should not be less than $3 million. . . . Over time, if the asset value is deemed to exceed the reasonable obligation for future support, the Court retains jurisdiction to make amended orders."

The court further ordered the trust to be funded with $1 million immediately, upon the execution of the trust, and to deliver a copy of the

7

trust agreement in escrow. Glen was ordered to execute all relevant documents within 10 days of the judgment.

Glen subsequently filed a request for order to modify spousal support. We discuss this separately in part IV of the Discussion section.

After his request for order was denied, Glen filed a notice of appeal. According to Kathy, he did not comply with the court's orders regarding the establishment of the spousal support trust.

## DISCUSSION

### I.

#### SECTION 4360 DOES NOT "VIOLATE" SECTION 4337

*A. Statutory Framework*

Section 4337 states: "Except as otherwise agreed by the parties in writing, the obligation of a party under an order for the support of the other party terminates upon the death of either party or the remarriage of the other party."

Section 4360, subdivision (a) states: "For the purpose of Section 4320,[6] where it is just and reasonable in view of the circumstances of the parties, the court, in determining the needs of a supported spouse, may include an amount sufficient to purchase an annuity for the supported spouse or to maintain insurance for the benefit of the supported spouse on the life of the spouse required to make the payment of support, or may require the spouse required to make the payment of support to establish a trust to provide for the support of the supported spouse, so that the supported spouse will not be left without means of support in the event that the spousal

_____

[6] Section 4320 sets forth all of the circumstances a court must take into consideration when ordering support.

8

support is terminated by the death of the party required to make the payment of support."

*B. Glen's Argument Is Simply Incorrect*

The heading for Glen's first argument in his opening brief states: "THE FAMILY CODE IS CLEAR THAT SPOUSAL SUPPORT TERMINATES ON THE DEATH OF EITHER PARTY. THE LOWER COURT'S AFTER-DEATH SPOUSAL SUPPORT ORDER VIOLATES FAMILY CODE SECTION 4337." (Boldface omitted.) He goes on to quote the Law Revision Commission Comments, 29F West Annotated Family Code (2025 ed.) section 4360, then quotes the order before asserting: "Missing from the lower court's order is a provision for termination upon Glen's death. There is further no agreement of the parties waiving termination of spousal support upon Glen's death. The lower court's spousal support order violates Family Code Section 4337 in that it does not terminate upon the death of Glen."

In his reply, Glen claims that he was not attempting to create "disharmony" between sections 4360 and 4337, asserting instead he was trying to "accentuate the position of Appellant that the after-death spousal support should require the application of factors to determine its use and must be adequately substantiated by the evidence and the court's reasoned application of those facts." While this does not reflect the actual argument offered in his opening brief, we deem it a concession that no conflict exists between the two sections.

The same conclusion may be reached based on basic principles of statutory interpretation. "[A] canon of statutory construction instructs that, where statutes conflict, "'more specific provisions take precedence over more general ones.'"" (*Edais v. Superior Court* (2023) 87 Cal.App.5th 530, 542; see

9

*Garcia v. McCutchen* (1997) 16 Cal.4th 469, 478.) Here, it could not be more evident that section 4337 is the more general statute and section 4360 is the specific one. Were we to find a conflict, the more specific statute would control.

Further, there is no actual conflict. "In ascertaining the meaning of a statute, we look to the intent of the Legislature as expressed by the actual words of the statute." (*Wasatch Property Management v. Degrate* (2005) 35 Cal.4th 1111, 1117–1118.) "Our role in construing a statute is to ascertain the Legislature's intent so as to effectuate the purpose of the law." (*Hunt v. Superior Court* (1999) 21 Cal.4th 984, 1000.) In doing so, we should avoid an interpretation that renders part of the statute superfluous. (*Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1048.)

Section 4337 provides that "the obligation of a party under an order for the support of the other party terminates upon the death of either party," but this is not in conflict with section 4360, which does not state otherwise. Rather, section 4360 allows the court to order the purchase of an annuity, the maintenance of life insurance, or the establishment of a trust while the supporting spouse is still alive. Section 4360 does not create a separate support obligation for the estate, for example, in a manner that might bring it into direct conflict with section 4337.

The Law Review Commission Comments, 29F West Annotated Family Code, *supra*, section 4360, at page 386, explains: "This section does not change the rule that the support order terminates when the support obligor dies. See Section 4337 (effect of death or remarriage). This section permits the court, where it is just and reasonable, to do so in view of the circumstances of the particular case to order (as a part of the support) insurance, an annuity, or establishment of a trust, where necessary so that

the supported spouse will not be left without means for support if the support obligor dies." As the Commission notes, the insurance policy, annuity, or trust is part of the support order at the time it is issued.

In short, the two statutes operate together, and there is no conflict.

## II.

### SUBSTANTIAL EVIDENCE SUPPORTS THE ORDER

*A. Standard of Review*

"'[T]he ultimate decision as to amount and duration of spousal support rests within its broad discretion and will not be reversed on appeal absent an abuse of that discretion. [Citation.]' [Citation.] "'Because trial courts have such broad discretion, appellate courts must act with cautious judicial restraint in reviewing these orders."'"(*In re Marriage of Ackerman* (2006) 146 Cal.App.4th 191, 207.) A lack of substantial evidence to support the court's decision may constitute an abuse of discretion. (*In re Marriage of Smith, supra*, 225 Cal.App.3d at p. 480.)

"Under [the substantial evidence] standard of review, 'the power of an appellate court begins and ends with the determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the finding of fact.' [Citation.] In so doing, we accept all evidence that supports the judgment, disregard contrary evidence, and draw all reasonable inferences to uphold the judgment. [Citation.] 'It is not our role to reweigh the evidence, redetermine the credibility of the witnesses, or resolve conflicts in the testimony, and we will not disturb the judgment if there is evidence to support it.'" (*Slone v. El Centro Regional Medical Center* (2024) 106 Cal.App.5th 1160, 1173.)

11

"[T]he direct testimony of a single witness is sufficient to support a finding unless the testimony is physically impossible or its falsity is apparent 'without resorting to inferences or deductions.'" (*People v. Cudjo* (1993) 6 Cal.4th 585, 608–609.) A party "raising a claim of insufficiency of the evidence assumes a 'daunting burden.'" (*Whiteley v. Philip Morris Inc.* (2004) 117 Cal.App.4th 635, 678.)

*B. Application of the Substantial Evidence Standard*

We note that Glen urges us to misapply the substantial evidence standard of review. In reviewing a substantial evidence challenge, *we ignore all contrary evidence* and determine whether the evidence the court relied upon was substantial as defined by the law. (*Slone v. El Centro Regional Medical Center, supra,* 106 Cal.App.5th at p. 1173.) But Glen claims we should take exactly the opposite approach, ignoring and discounting the evidence the court relied upon and referring only to evidence in support of his position. He identifies "unique facts presented at trial [which] were all in favor of [Glen]."

The first "unique fact" refers to Kathy's saving of money Glen gave her during the marriage, which, according to Glen, shows "financial security." The second "unique fact" is that Glen transferred the family home into both parties' names during the marriage, giving Kathy "additional financial security." This is simply not how a substantial evidence review is undertaken. (*Pope v. Babick* (2014) 229 Cal.App.4th 1238, 1245 ["We do not review the evidence to see if there is substantial evidence to support the losing party's version of events, but only to see if substantial evidence exists to support the verdict in favor of the prevailing party"].)

Similarly, in Glen's reply brief, he claims for the first time that the court erred by determining that his physical condition was "frail," again

12

offering only evidence that supports his claim. He also contends for the first time in his reply brief that the trial court disregarded whether Kathy could gain meaningful employment. Again, he offers only the evidence in support of his position—the testimony of a witness that in 2014 (eight years before trial), Kathy could have earned $120,000 a year as an accountant—disregarding the evidence the trial court relied upon.[7]

Glen's approach to a substantial evidence analysis is without merit. Indeed, his failure to set forth all of the facts fairly waives his right to assert a lack of substantial evidence. "In every appeal, the appellant has the duty to fairly summarize all of the facts in the light most favorable to the judgment. [Citations.] 'Further, the burden to provide a fair summary of the evidence "grows with the complexity of the record. [Citation.]"' [Citations.] To meet its burden on appeal to show a finding of fact is not supported by substantial evidence, appellants cannot recite only evidence in their favor, but must "'set forth in their brief *all* the material evidence on the point and *not merely their own evidence.* Unless this is done the error is deemed to be waived.""" (*Slone v. El Centro Regional Medical Center, supra,* 106 Cal.App.5th at p. 1173.) In the interests of justice, we will briefly address the merits.

---

[7] Glen has waived any error by failing to raise these issues in his opening brief. (*Schubert v. Reynolds, supra,* 95 Cal.App.4th at p. 108; *In re Marriage of Khera & Sameer* (2012) 206 Cal.App.4th 1467, 1478.)

*C. Because Substantial Evidence Supports the Imposition of a Trust Under*

  *Section 4360, No Abuse of Discretion Occurred*

Section 4360 is clear that it is to be construed in light of section 4320, which sets forth the factors the court is to consider when awarding spousal support. These include the supported party's need for support based on the marital standard of living. "'The first of the enumerated circumstances, the marital standard of living, is relevant as a reference point against which the other statutory factors are to be weighed. [Citations.] The other statutory factors include: contributions to the supporting spouse's education, training, or career; the supporting spouse's ability to pay; the needs of each party, based on the marital standard of living; the obligations and assets of each party; the duration of the marriage; the opportunity for employment without undue interference with the children's interests; the age and health of the parties; tax consequences; the balance of hardships to the parties; the goal that the supported party be self-supporting within a reasonable period of time; and any other factors deemed just and equitable by the court.'" (*In re Marriage of Ackerman, supra,* 146 Cal.App.4th at p. 207.) Glen does not contest that Kathy was entitled to spousal support under section 4320.

Section 4360 requires the court to find that requiring the supporting party to maintain insurance or establish a trust to pay support must be "just and reasonable in view of the circumstances of the parties." At the time of the order, Kathy was "nearly 65" and Glen was 78. During trial, Glen was living in an assisted living home. His Income and Expense declaration showed that he required the assistance of caregivers 16 hours a day. Kathy's actuarial life expectancy was 22 years, which the court found was "far greater" than Glen's.

14

The court had substantial evidence to support its conclusion that Kathy required spousal support for the remainder of her life. "At nearly 65 years old, she is already of retirement age and has been out of the fulltime workforce for decades. One reason she has been out of the workplace for so many years is her commitment to being a stay-at-home spouse and mother during her prime earning years." The court found Kathy had "no capacity" to support herself at or near the marital standard of living, which was $29,635 per month, without spousal support.

Due to the premarital agreement, there was little in the way of community property except for a partial interest in the family home. While Glen had a net worth exceeding $24 million, Kathy's assets were comparatively "minimal." She had roughly $1.2 million in investments. An IRA, her sole retirement account, was worth $127,000.

Based on the parties' wildly disparate net worth, their relative ages and differing life expectancies, and the cost-prohibitive nature of obtaining life insurance for Glen based on his age, we find the court had substantial evidence from which to conclude security for spousal support was "just and reasonable in view of the circumstances of the parties." We find no abuse of discretion.

III.

"RARE, DRASTIC, AND UNUSUAL REMEDY"

Glen next contends that the existing published cases discussing section 4360 include different facts than the instant case. This is true. Section 4360 does not often appear in case law, but this is not particularly surprising. Only rare dissolution cases involve a litigant with a net worth exceeding $24 million and a marital standard of living of over $29,000 a month.

15

Glen also claims the paucity of case law on this issue legally establishes that section 4360 is a "rare, drastic, and unusual remedy." He offers no citations to authority for the implication that either the trial court or this court must therefore make special or additional findings before applying the code as written. Any such implication would be incorrect. The only requirements of section 4360 are set forth in the statute— the court must find that an order under the statute "is just and reasonable in view of the circumstances of the parties." (§ 4360, subd. (a).) The court, as we explained above, did so here.

IV.

REQUEST FOR ORDER

Glen's last argument is that the court abused its discretion by denying his request for order to modify or eliminate spousal support based on Kathy's alleged cohabitation.

*A. Relevant Background*

In February 2024, Glen filed a request for order based on "information and belief" that Kathy was cohabiting with a nonmarital partner, Gregg A. Glen filed this request for order after the court filed the statement of decision in June 2023, but before judgment was entered in March 2024. Glen's request was denied without a hearing on the grounds that there were no material issues outstanding which would prevent the court from signing the judgment, which had been the subject of numerous conferences between the parties.

16

Glen filed a motion for reconsideration under Code of Civil Procedure section 1008, which the court deemed a motion for new trial.[8] The court decided to hear the motion. Glen's opening brief does not refer to any evidence at all in support of the motion, but the record reflects he submitted a declaration. The declaration stated that after he moved back into the marital home, he "notic[ed] reoccurring mail" in the name of Gregg A., including "drug prescription information" showing Gregg A. "received his prescribed medications" at the home and "correspondence . . . from his insurance carrier." His declaration also stated he relied on statements by "neighbors" that Gregg A. and Kathy were cohabiting and had been "for at least two (2) years."

Kathy filed a declaration in response to the motion in which she denied cohabiting with Gregg A. Gregg A. lived in San Bernardino County and stayed with Kathy approximately two days a week on average. She stated that contrary to Glen's assertions, she had made no effort to hide the existence of a boyfriend. Kathy acknowledged some medication was delivered because it required refrigeration. She called into question the reliability of the neighbors Glen had spoken to based on detailed accounts of personal animus.

Gregg A. also filed a declaration. He stated he currently resided in San Bernardino County, where he had lived for approximately 20 years. He paid his own living expenses and at all times maintained his own residence. During Kathy's dissolution proceedings, he stayed with her at the

---

[8] From this point, we refer to this proceeding as a "motion" because the court treated it as such.

17

Newport Beach home an average of two to three times per week. Except for dinner dates, he did not contribute to Kathy's living expenses.

Kathy also filed evidentiary objections to Glen's declaration.

The transcript of the hearing on Glen's motion is not in the appellate record, at least as far as we can find. The court ultimately issued a written order denying the motion for new trial. The court noted that newly discovered evidence, meaning evidence that could not have been discovered through due diligence, was required to prevail on a motion for new trial. The evidence established that both parties had access to the marital residence, including during the period Kathy resided there alone. The court found that Glen had failed to rebut Kathy's evidence showing that Glen had driven by her home on numerous occasions and that he had access to the community portal for gate access. Despite reasoning this was sufficient ground to deny the motion, the court considered the merits.

The court ultimately found that Glen had not met his burden to establish that the new evidence proffered, if it had been produced at trial, would have been likely to prove a different result. He had not met his burden to establish that Kathy was cohabitating. The mail addressed to Gregg A. produced by Glen were envelopes only and did not reveal the contents. The court noted the "entire haul amounted to a letter from a hospital foundation and 3 pieces from Nationwide Insurance Company, and a golf magazine, all machine-addressed." Further, the evidence showed that Gregg A. had at all times maintained a separate residence in San Bernardino County.

The court largely struck the declarations of the two neighbors produced by Glen, finding them "overreaching and speculative." It was also clear from the neighbor declarations and Kathy's responsive declaration that the neighbors "despise [Kathy] and that these feelings have manifested in

18

shouting, pushing, and police involvement. The court gives little credibility to the accounts of the 2 people on [Kathy's] street that she avoided."

Finally, the court noted that had the burden shifted to Kathy to prove that her need for support was not reduced as a result of cohabitation, Kathy had "produced unrefuted evidence that her relationship with [Gregg A.] serves no economic benefit in reducing her reasonable monthly expenses, found by the court to have been at the marital standard of living. The motion for new trial, whether deemed a motion for reconsideration, or otherwise, is denied."

*B. Glen's Arguments*

In his opening brief, the only complaint Glen makes about this motion is that the court did not set an evidentiary hearing. For the first time in his reply brief, he raises what he claims are two evidentiary errors and a lack of evidence as to one of the court's factual findings on the motion for new trial. As we noted previously, it is improper to raise new issues in the reply brief. We disregard these contentions. (*Schubert v. Reynolds, supra,* 95 Cal.App.4th at p. 108; *In re Marriage of Khera & Sameer, supra,* 206 Cal.App.4th at p. 1478.) Glen's arguments are limited to those he raised in the opening brief, meaning the court's purported failure to hold a full evidentiary hearing.

1. Initial Request for Order

The opening brief is unclear about the legal basis for Glen's complaints about the lack of an evidentiary hearing. The request for order was filed after the statement of decision was issued but before judgment was entered. As the court noted in its denial, the court had "supervised numerous conferences between the parties to finalize the language of the judgment and attachments." Glen's request for order was the first time he had raised this

19

alleged cohabitation issue. The court, accordingly, found "there were no material issues outstanding which would prevent the court from signing the judgment awarding spousal support." The court went on to note that it had been suggested that Glen was refusing to sign the necessary trust documents, an issue the court intended to raise separately. But the implication was that this request for order was a delaying tactic.

Nonetheless, under section 217, the court should have held a hearing or made the required findings under California Rules of Court, rule 5.113. But because a hearing was held on the motion for new trial (see below) and because the court considered the motion on the merits at that time, this error was ultimately harmless. At the hearing on the motion for new trial, the court went beyond determining whether Glen had met the diligence requirements of a motion for new trial, and "examine[d] the merits of the motion." Accordingly, any failure to hold a hearing on the initial request for order was harmless.

2. Motion for New Trial

Glen's complaint about the motion for new trial is not on the merits of the court's ruling, but the purported failure to hold a full evidentiary hearing with testimony. There is evidence this is exactly what the parties agreed to. Further, Glen fails to establish he was entitled to a full evidentiary hearing in the first place.

Counsel and the judge exchanged e-mails regarding procedural issues prior to the hearing on Glen's motion. Two days before the hearing, the judge and the parties addressed the scope of the hearing. The judge wrote: "We are set for hearing on Wednesday May 8, 2024 at 10:00 A.M. Please report back with the following: (1) Is this a hearing we could could [*sic*] conduct via Zoom? (2) What witnesses will testify and for how long? (3)

Including arguments, how long do we estimate for the total hearing length, (4) Have exhibits been exchanged, pre-marked . . . to be received in evidence?"

Kathy's counsel responded first: "This is a motion hearing (motion for reconsideration, deemed motion for new trial) done as a 'true motion' and on the papers/declarations and not an evidentiary hearing based on my understanding and research." He wrote a second message quickly thereafter, stating: "It was my understanding the parties would appear in person. I believe each side would have an hour each for argument."

Glen's counsel responded: "I concur with Mr. Tuttle, and zoom would be acceptable to [Glen]."

The judge replied: "I believe we are on the same page. (See, CRC 3.1306). Thank you for the courtesy of the Zoom appearances. We will proceed with parties and counsel at 10:00 A.M."

Kathy's counsel did not seem to agree about the Zoom appearance and replied: "We are on the same page as to it being a 'true motion' and not evidentiary hearing but we had issued a Notice to Appear to Mr. Nelson and believe this is an 'in person' motion hearing for the parties." That was the end of the discussion, however.

It is clear from this exchange that both parties agreed to proceed on the declarations and without a full evidentiary hearing. Glen, for the first time in his reply brief, treats this exchange as if it were a mystery. "Same page as to what?" Kathy's counsel stated not once, but twice, that his understanding was that the hearing would proceed "on the papers/declarations" and it was "not an evidentiary hearing." Glen's counsel had every reason and opportunity to speak up if this was not his

understanding. He did not, nor does Glen cite to the record demonstrating an objection at the hearing itself.

Moreover, as the court indicated with its citation to California Rules of Court, rule 3.1306, Glen was not entitled to a full evidentiary hearing: "Evidence received at a law and motion hearing must be by declaration or request for judicial notice without testimony or cross-examination, unless the court orders otherwise for good cause shown." (Rule 3.1306(a).) A motion for new trial is a law and motion hearing. Glen never suggested below that he sought a full evidentiary hearing. According to the record, he made no attempt to make a showing that good cause required a full hearing. We find no error.

## DISPOSITION

The judgment is affirmed. Kathy is entitled to her costs on this appeal.


MOORE, ACTING P. J.

WE CONCUR:


SANCHEZ, J.


BANCROFT, J.*


*Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

22